LoKiNG, J.,
delivered the opinion of the court:
In this case the petition sets forth that the petitioner is a citizen of Wheeling, in the State of West Virginia,* that certain specified personal property, of his was seized and libeled on the ground of his alleged treason and rebellion, and by the decree of the United States district court for the district and State of West Virginia was condemned and forfeited to the United States under the Act July 17, 1862, and sold, and the net proceeds, amounting to $11,000, were paid into the Treasury; and he avers that, by virtue of the Presidents Proclamation, December 23, 1868, he was pardoned and released of all disabilities and penalties attaching to the offense of treason and rebellion for which said property was confiscated, and by virtue thereof has been restored to all his rights, privileges, or immunities under the Constitution of the United States and the laws made in pursuance thereof, and that he is entitled to receive from the United States the said proceeds of sale; and he prayed judgment for $11,000.
The defendants filed a general demurrer to the petition, and on that issue was joined, and the case argued and submitted to the court.
The learned' counsel for the petitioner, in their argument, referred us, for the eonstrufetion of the word “ pardon,” in the second section of the second article of the Constitution, to the following sentences of Chief-Justice Marshall, iu delivering the opinion of the Supreme Court in the case of the United States v. Wilson, (7 Pet., 150.) In that case the Chief-Justice said as follows :
“ The Constitution gives to the President, in general terms, the power to grant reprieves and pardons for offenses against the United States.
“As this power has been exercised from time immemorial by the executive of that nation whose language is our language, and to whose judicial institutions ours bear so close resemblance, we adopt their principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who w'ould avail himself of it.”
On this authority, the word “pardon” in the Constitution is *399 to be construed according to its signification in English law at. the time the Constitution was adopted. And the question is, what was that signification 7
By the theory of the English government, the king was lord paramount, from whom all lands were held in such estates as he pleased to grant, on the condition of service to him.
Lord Coke says : “All the lands within the realm were originally derived from the king, and therefore the king is sovereign lord, or lord paramount, either mediate or immediate, of all and every parcel of land within the realm.” (1 Inst.)
And the services on which the grants of estates by the king were conditioned always included homage and fealty, so that treason was a breach of the condition upon which the lands were held, by which breach the lands were forfeited to the king, and thus returned to him by the necessary operation of a condition at the common law.
The effect was that the treason annulled the tenant’s estate, which fell from the lands, and left the original title of the king as it was before the estate was granted, and free of the encumbrance which the grant of it created. And in this the king derived nothing of title from the tenant; but.merely held the land by his own original title as lord paramount, and simply as crown lands. And of these, Blackstone says : “The demesne lands, terree dominicales reejis, being either the share reserved to the crown at the original distribution of landed property, or such as has come to him by forfeitures or otherwise.” (1 Com., 286.)
I have cited Blackstone’s Commentaries because that work was contemporaneous with our Constitution, and brought the law of England down to that day, and then, as now, was the authoritative text-book on its subject, familiar not only to the profession, but to all men of the general education of the founders of our Constitution. Mr. Burke, in his speech “ On conciliation with America,” delivered in March, 1775, referring to information derived from “ an eminent bookseller,” as to the great exportation of law-books to this country, says: “ The colonists have now fallen into the way of printing them for themselves. I hear that they have sold nearly as many of Blackstone’s Commentaries in America as in England.”. That book, therefore, thus belongs to the precise time to which our *400 question relates, and is especially authoritative on its subject, and therefore I shall continue to cite it.
The title of the crown lands, being thus in the king, could be divested from him only as other titles were divested, by the grant-of the owner. And the king, like other owners, was free to grant them to whom he pleased, and therefore might grant them again to their former tenant, who had forfeited them, or to any other person, as he pleased. And so he might grant what estate in them he pleased, and that absolutely or conditionally, as he pleased; and in this there was no connection with or recourse to the power of pardon, for it was the necessary result of title and the rules of tenure in the English feudal law.
And it is observable that that system was not, like the civil law, a system of jurisprudence founded on the principles of natural equity, but a state policy, and conventional merely. Its purpose was the establishment of government on the tenure of land, which was then the only permanent means of men’s support. For mere personalty was then of little comparative value; it consisted chiefly of food, clothing, and arms, and was perishable in its nature and consumed in its use. It was, therefore, in legal language, incapable of a limitation over; and as it thus could not further the purpose of the system, it was little regarded in its law, but held to be merely an incident to tenure, and following its .results. Thus Sir Charles Yorke, in his “ Considerations on the Law of Forfeiture by Treason,” says as follows: “ Goods and personal things: they were taken to be the produce of the feud and belonging to it, and were forfeitable in whole or in part for offenses of inferior moment.” (p. 69.)
Such, in brief, is the theory and the history of forfeitures of lands and goods in the early English law, and of that title to them in the king by which, and by which alone, he could grant them to whom he pleased and as he pleased. And the doctrine of the restoration of forfeitures had then and has now no other foundation.
Blackstone brings this ancient law down to the time of our Constitution, and distinguishes carefully between the ordinary and the extraordinary revenue of the crown. The latter, the extraordinary revenue, were grants of Parliament for the general expenses of the national government, aiid could be disposed *401 of only according to the act of Parliament. The ordinary revenue was, in the expressive phrase of Blackstone, “the proper royal patrimony,” and as such disposable by the royal grant. He thus defines it: “The revenue is either ordinary or extraordinary. The king’s ordinary revenue is such as has either subsisted time out of mind in the crown, or else has been granted by Parliament by way of purchase or exchange for such of the king’s hereditary revenues as were found inconvenient to the subject.” (1 Com., 25Í.) And necessarily that which had been an exchange for any part of the hereditary revenue of the crown stood in its place as part of the royal patrimony, and subject to its incidents.
And of this “ ordinary revenue ” of the crown, or “ proper royal patrimony,” which had subsisted time out of mind in the king, Blackstone states eighteen sources, such as the revenues of vacant sees, first fruits of spiritual preferments, rents of crown lands, mines of gold and silver, wrecks, waifs, treasure-trove, royal fish, deodands and forfeitures, &c. And of these last Blackstone says: “ 16th. The next branch of the ordinary revenue of the king consists in forfeitures of lands and goods for offenses.” And after stating the general ground of forfeitures, he says: “ Hence in every offense of an atrocious kind the laws of England have exacted a total confiscation of the movables or personal estate, and in many cases a perpetual, in others only a temporary, loss of the offender’s immovables or landed property, and have vested both of them in the king, who is the person supposed to be offended, being the one visible magistrate in whom the majesty of the public resides.” (1 Com., 299.)
And as this “ordinary revenue” belongs to the king in exclusive title, he consequently, and he only, may dispose of it. And from the earliest times such ordinary revenue has been the means of royal grants, and constituted the royal franchises of English law. Blackstone says, (1 Com., 302:) “ Deodands and forfeitures in general, as well as wrecks, treasure-trove, royal fish, mines, waifs, and estrays, may be granted by the king to particular subjects as a royal franchise.” (4 Com.)
And it is a matter of familiar history that these grants of the sources of the ordinary revenue of the crown were so lavishly made by successive kings who for their purposes squandered the patrimony of their successors, as to impoverish the *402 crown and reduce it to dependence on Parliament. And to save what remained of the royal inheritance, in the first year of Queen Anne’s reign an act was passed restricting royal grants of crown lauds. But from this act forfeitures were expressly excepted, so that these remained, as at the common law, in the king’s exclusive control.
This history of the ordinary revenue of the crown, “ the proper royal patrimony,” shows that the title to forfeitures of realty and personalty is vested in the king, exactly as is the title to the other specified sources of his ordinary revenue. And, as a consequence of such title, he may dispose of any or all of them as he pleases; and therefore his po wer of disposing of forfeitures is no more inherent in or pertaining to his power to pardon than is his power to dispose of waifs, or wrecks, or deodands, or royal fish.
And in the English law all the text-books, from Coke to Blackstone and since, refer the king’s power to restore forfeitures to his title ,• and by that all the rules relating to the restoration of forfeitures are shaped.
Lord Coke, in defining pardons, says : “A pardon is a work of mercy, whereby the king, either before attainder and sentence or conviction, or after, forgivetk any crime, offense, punishment, execution, right, title, or debt or duty, either temporal or ecclesiastical. All that is forfeited to the king he may restore by his charter. And this directly refers his power to restore to his title, for it limits it to that.” (3 Inst., 233, Pardon.)
And under the head of restitution, Lord Coke says gs follows: “And the reason wherefore the king may by his charter pardon the execution and restore to the party or his heirs the land forfeited by his attainder, and remaining in the crown, is for that no person hath thereby any prejudice.” Here, again, the restoration of the forfeiture is referred to title merely, for what is his own the king can convey, because it affects only himself; and Lord Coke in express worils confines the restoration to the property “remaining in the crown.” (6 Restitution, 3 Mill, 240.)
And because the king’s power to restore results only from his title, it has always been the law in England, as it is now, that where a statute vests the forfeiture or any part of it in the subject, the king can restore only his own, and cannot restore what the law has given to the informer. Hawkins (P. C., 548,) *403 says : “ I take it to be a settled rule that the king cannot, by any dispensation, release, pardon, or grant whatever, bar any right, whether of entry or action, or any legal interest, benefit, or advantage whatsoever, before vested in the subject.”
And by the common law title can .be divested only by some mode or form of conveyance or transfer, and, where that is in writing, it must contain words of donation manifesting the intent to convey and efficient for it. And hence the rule is, and always has been, that a pardon, to effect a restoration of a forfeiture, must contain words of restitution, and thus be expressly a grant of property as well as the pardon of a crime. And unless such express words of restitution are contained in the pardon it is not a grant of property, but a pardon of a crime merely.
And the only reason for the requirement of words of restitution is that the title and ownership of the property are in the king; for if they were not his, words of restitution would be of no avail. And the rule is referred to here only to show that such title and ownership were in the king, in the English law.
A leading case for the rule was cited by the learned counsel for the Government from 1 Lev., 120. It is better reported by a better authority, 1 Saund., 362. In that case Toombes, administrator, brought a scire facias against Etherington on a judgment for £2,000 2s. recovered against him by the intestate. The defendant pleaded that the intestate, after the rendition of the judgment, committed suicide, and was found felo de se. and his goods were forfeited to the king. The replication was the act of 12 Car. II, c. 11, “ of free pardon, indemnity, and oblivion,” subsequent to the suicide, whereby the judgment of £2,000 2s. was discharged from any forfeiture. Judgment was rendered for the defendant. And the court said as follows: “ When the inquisition was returned tó the king’s bench which found the felony of himself, then were the debt aud damages vested in the king, and by the act he has not granted restitution of it to the plaintiff, administrator. And for want of restitution the plaintiff cannot have it, and it remains in the king.”
And the note by Saunders shows that the king brought a scire facias on the judgment against Etherington, and he pleaded the same act of “ free pardon, indemnity, and oblivion” of 12 Car. II, c. 11, which contained words of release of all judgments. &c. And the court held that such words of release dis *404 charged the judgment itself, and released the debtorfrom it; and this shows that the restoration of property is not the legal incident of pardon, for by the same act of Parliament the pardon of the offense went to one man and the grant or release of property to another.
There is but one case in the English law where' the restoration of property follows a pardon, and there it is not incident to it, but only accompanies it; and that is in the case of excusable homicide, under the statutes of Gloucester, which was in affirmance of the common law, and prescribes the proceedings, where it is found by verdict that the homicide was in self-defense or by mere accident. In the earliest practice, on such a verdict the prisoner was remanded to jail to await the king’s grace. Later the practice was to certify the verdict into chancery, and thereupon the chancellor, as a matter of course, and without submitting the case to the king, issued a writ for the pardon of the prisoner and the restoration of the property forfeited. And afterward, to save the cost and delay of these mere forms, the. modern practice was adopted, in which the court on the verdict render a judgment of acquittal, which prevents the forfeiture. Of course the case was exceptional, for in it there was no guilt; and Blackstone, after speaking of the ancient practice, says as follows, (4 Com., 188:) “ The delinquent has now, and has had as early as our records will reach, a pardon and restitution of his goods as a matter of -course and right.”
And Hawkins (P. 0., 530) says of the practice in his time ■and before as follows: “However, it seems to have been always agreed that the forfeiture of goods by such homicide may be saved by a pardon, (which in this particular case seems to purge the guilt ab initio?) This is a clear implication that in his day in other cases pardon did not purge the guilt ab initio, but only exempted from the punishment. And it shows also how much less effect was then given to a pardon in authoritative textbooks on the criminal law than is now often claimed for it in modern American decisions, and how gradually it has reached the utmost effect now given it in English text-books, of removing disabilities and prosecution from and after the pardon. Mr. Bussell, in his text-book on criminal law, (vol. 1, p. 975,) says as follows: “ It was formerly doubted whether a pardon could do more than take away the punishment, but it *405 is now settled that a pardon, whether by the king or act of Parliament, removes not only ,the punishment but all the legal disabilities consequent on the crime.” And it is thus that a pardon restores a man’s competency as a witness, (leaving his conviction to go to his credibility,) or his right to be guardian to his children, &c. And this removal of disabilities seems the proper and the utmost proper effect of a pardon, which, operating from its date, should preclude any further effect of the offense pardoned. But this is a different thing from giving the pardon a retroactive effect, and making it of itself divest property vested in the king, and of which by the’ general rules of law he could be divested only, as of any other part of his royal patrimony, by his own grant.
And the text-books, in treating of pardon, divide their subjects into heads and make the last “the effect of a pardon.” And in thus speaking directly on the effect of a pardon, not one of them refers to or indicates the restoration of forfeited property as incident to a pardon and the legal consequence of it, or attributes to a pardon any further effect than the removal of disabilities and prosecutions. Of these books the highest authority for our special purpose is Blackstone, who says as follows : “ Lastly, the effect of such pardon by the king is to make the offender a new man, to acquit him of all corporal penalties and forfeitures annexed to that offense for which he obtains his pardon, and not so much to restore his former as to give him new credit and capacity.” (4 Blackst. Com., p. 401.) Now, all this refers to the future operation of the pardon, and especially so the words connected .with forfeitures, which are “to acquit him of all corporal penalties and forfeitures.” Now, to acquit is to discharge, and a man cannot be acquitted of a corporal punishment, a branding or whipping, he has already suffered $ and forfeitures stand in the same sentence.
And the omission of the English text-books to refer to the restoration of forfeitures as an effect of pardon would seem to follow logically from the fact that in the English government the power to restore forfeitures and the power to pardon have no connection with and no relation to each other.
We have seen that forfeitures were a part of the “ the ordinary revenue ” of the crown, of “ the proper royal patrimony,” of any part of which the king might dispose, because the title was in him, exactly as any other man may dispose of any part *406 of bis inheritance. But the king’s power to pardon crime was one of bis prerogative powers, (1 Blackst., 269,) vested in him as the executive of the nation, and which he held as a means of' government, and of which he could no more dispose than he could of his forts, fleets, and armies, the command of which was another of his direct prerogative powers. So that the king’s power to pardon and his power to restore forfeitures were of different origin and different natures, and had no other connection than being vested in the same person; while in our Government they are not, but are carefully separated and vested in different branches of the Government. For under our Constitution forfeitures belong to the United States; they are prosecuted in their name and expressly confiscated to them by the judgment rendered, and, like other public property, can be disposed of only by Congress, in whom the Constitution has placed the power “ to dispose ” of property belonging to the United States; while to the President the Constitution has given the power to pardon crime, and no other or greater power than is incident to and inherent in that power in the common law of England.
And it is to be remembered always that this distinctness of powers makes the scheme of our Government, and is essential to it, for to each branch, of the Government its power is carefully meted out. And when the Constitution gives to Congress the power to dispose of the public property, and provides that no money shall be drawn from the public Treasury except by an appropriation made by law, it positively excludes the President from any control of the national property, real or personal. •And so it has always been held; and the forfeiture in this case was by the judgment that confiscated it to the United States as absolutely national property then as this Capitol is now.
And as at the time of the adoption of our Constitution the king’s power to restore forfeitures was merely the legal consequence of his title in them, and was not derived from and made no part of his direct prerogative-power to pardon crimes, we think that the second section of the second article of the Constitution, in vesting in the President the power to pardon crimes, did not authorize him to restore forfeitures or to dispose of that part of the national property7.
By the Act July 17, 1862, Congress authorized the President to grant to those who had participated in the rebellion “ par *407 don and amnesty,” and both of these wor ds are used in the Proclamation of December 25, 1863. As the legislature can neither extend nor restrict the power of the Executive t o pardon crimes, the only question arising here is whether the word “ amnesty,” in the act of Congress, authorized the President to restore forfeitures.
What maybe the technical meaning of effect of the word “ amnesty” in other countries, under different forms of government and different systems of law, is foreign to our subject. But the word “ amnesty ” does not belong to the common law, and has no technical meaning in it, and can be used in it only in the meaning of its synonym in our language, and that is oblivion. For the derivative and literal meaning of amnesty is removed, from memory; and in the English law oblivion is the synonym of pardon, and is so used in it. For the act of 12 Gar. II, c. 11, is entitled uAn act of free pardon, indemnity, and oblivion,” 3 Stat. L., 166,) and these are also its special words of grant, and the case under that act, of Toombes, Administrator v. JEther-incjton, heretofore cited from 1 Saund., 362, therefore decides expressly that 'a grant of “ free pardon, indemnity, and oblivion” by an act of Parliament does not effect or include the restoration of forfeitures; and we know of no decision or authority in English law that decides a grant of amnesty is or can be anything more than a grant of oblivion.
The word “amnesty” properly belongs to international law, and is applied to treaties of peace following a state of war, and signifies there the burial in oblivion of the particular cause of the strife, so that that shall not be again a cause for war between the parties •, and this signification of “ amnesty” is fully and poetically expressed in the Indian custom of burying the hatchet. And so amnesty is applied to rebellions which by their magnitude are brought within the rules of international law, and in which multitudes of men are the subjects of the clemency of the government. But in these cases and in all cases it means only oblivion, and never expresses or implies a grant.
It is observable that the executive proclamations for pardon previous to that of December 25,1868, proffered in terms a restoration of property, while the Proclamation of December 25, 186S, relied upon in this case, used the words “ restoration of rights, and privileges, and immunities,” and it might be that *408 these words would be satisfied by a mere removal of disabilities. But we have not sought to found an argument on this difference of phraseology.
On the whole case, we are of opinion that the Proclamation of December 25,1868, does not entitle the petitioner to a restoration of the confiscated property claimed in his petition. And the order of the' court is that the petition be dismissed.
The Chief-Justice did not sit on the trial of this case or take part in its decision.