Scofield, J.,
delivered the opinion of the court:
Claimant entered the Army as an enlisted man, January 30, 1851; and as an enlisted man, corporal, sergeant, second and first lieutenant, continued in the service until June 1,1865. Prior to that time he had been tried by a court-martial and found guilty of u receiving bribes ” and of “ conduct unbecoming an officer and a gentleman,” and sentenced “ to be dishonorably dismissed the service, with forfeiture of all pay and allowances now due or which may become due to him, and that he be forever hereafter disqualified from holding any office of honor, trust, or profit under the Government of the United States.” May 10,1865, the finding and sentence was approved by the President; he was ordered to be dismissed from the service. Notice of the dismissal was not given to the claimant until June 1, 1865. The order was first promulgated then and took effect from that date.
December 27,1865, an order was issued by the President reciting the aforesaid proceedings and concluding: “ Upon the recommendation of the júdge-advocate, and in consideration of additional evidence exonerating Lieutenant Vanderslice of the guilt attaching to the sentence, the sentence is remitted and he is hereby reinstated as of the date of his dismissal.” Thereupon he was recognized by the War Department as a first lieutenant and as such assigned to duty. He served in that capacity until March 22, 1866, when he was appointed by the President, by and with the advice and consent of the Senate, a captain.
*483 April 23, 1879, he was placed upon the retired list.
The claim is for the increase of longevity pay allowable under the ruling in the Tyler Case. (16 C. Cls. R., 223; affirmed on appeal, 105 U. S. R., 244.)
In calculating this pay, the claimant thinks he should be credited with full time from January 30,1851, to the present time. If so credited, he is entitled to recover, after making the proper deductions, as additional longevity pay, the sum of $23.23.
The dispute about time, and every other dispute in the case, ■ grows out of the order of the President by which “ the sentence was' remitted ” and claimant “ reinstated as of the date of his dismissal.” In some respects, both the validity of the order and its effect, if valid, are in dispute.
If the order is to be considered as a revocation by the President of his approval of the finding and sentence by the court-martial it falls under the rule laid down by the Supreme Court in Mimmack's Case (97 U. S. R., 426), and followed by this court in the cases of Bennett, Montgomery, Balen, Bunlcle, and Miller (ante), and so far as it purports to reinstate the claimant in the Army is invalid. In all of these cases it is held that there is but one way by which an officer who has been completely severed from the Army, in a manner provided by law, can be again restored tout under existing law, and that is by an appointment by the President by and with the advice and consent of the Senate. While the decision of the Supreme Court ought to be conclusive of the question, it may not be amiss to show that Congress and many high executive officers have hitherto entertained and officially announced the same opinion.
By the act of July 20, 1868, entitled u An act declaratory of the laws,” &c. (15 Stat., 125), Congress provided that—
“ No officer of the Army who has been or may be dismissed from the service by the sentence of a general court-martial, formally approved by the proper reviewing authority, shall ever be restored to the military service except by a reappointment confirmed by the Senate.” '
The proceedings in this case occurred before the passage of this act, but, as appears by the title, the act was declaratory of the law, applying to the past as well as the future. Thus it appears that Congress understood the law to be as the Supreme Court subsequently declared it.
*484 It will be observed that this declaratory act of Congress extends only to dismissals by sentence of courts-martial; but it should not be inferred from this that Congress considered the constitutional provision for restoration to the Army any less applicable' or controlling in cases where the dismissals were made by other legal methods. The debate upon the bill, as well as the political history of the times, clearly indicate that Congress was aiming to avoid what they then considered a threatening danger, and further than that took no note of the law. But in all cases the principal is the same. By which of several legal methods an officer goes out of the service by the act of the President, whether by his approval of a sentence by a court-martial, his acceptance of a voluntary resignation, or his approval of the finding of a retiring board, makes no particular difference. In each case the question is whether he is entirely and legally out; if so the Constitution takes hold of of the case, and, regardless of how he got out, directs the only mode of return.
Attorney-General Evarts, in answer to the question “ whether the revocation by the President of the acceptance of the resignation of Captain Mimmack had the effect of restoring him to his former position in the military service,” advised the President as follows :
“This question, I think, must be answered in the negative. Upon the facts as stated, it is clear that there was a valid resignation and an unconditional acceptance of it, the concurrence of which operated to remove the incumbent from his office in the military service, and nothing short of a new appointment could have the effect of restoring him to that office. Cases, I am aware, have occurred in which a resignation and acceptance of it by the President or other proper authority were not supposed to have been attended with such consequences. But in those cases it was held there was no valid and efficient resignations, and the acceptance of the President or other proper authority was inoperative, and therefore capable of being recalled or withdrawn.” (12 Opins., 555.)
Attorney-General Devens, in reply to a similar interrogatory relative to the case of Major Eunkle, in an unpublished opinion given to the President June 6, 1877, says:
“My answer is that the sentence in the case referred to, having been lawfully confirmed and (except as to the part remitted) carried into execution, the proceedings are not now open to *485 review by the President $ they have passed beyond his control and are at an end.”
Winthrop, in his Digest of the Opinions of the Judge-Advocates-General of the Army (pp. 389 and 390), states the law as understood and disclosed by these successive officers as follows:
“ The President acts as a reviewing authority, and may approve or disapprove in whole or in part the proceedings or sentence, or, in approving, mitigate the punishment. But when final action has been taken by him in any of these cases his function as reviewing or confirming authority is exhausted. Where, indeed, he has approved or confirmed a punishment, and the same remains in any part unexecuted, he may, of course, exercise the quite distinct power of pardon; but an approval or disapproval once given by him and duly notified to the accused, though his action may afterwards be discovered to have worked an injustice, is beyond his power to revise, reverse, or modify.”
In the discussion involving the power of the President to revoke an order of dismissal, based upon the, sentence of a court-martial or otherwise, it should be kept distinctly in view that only a single effect of such revocation is in controversy, to wit, the restoration of the dismissed officer to the Army. Other effects of revocation, which may be in the nature of pardon, have not been under consideration. The law is not necessarily the same in both cases. One case involves the constitutional mode of appointment and the other may not. We go no farther than to hold that restoration is not accomplished through revocation. This is the plain rule prescribed in the Constitution, decided by the Supreme Court, declared by Congress, advised by the Attorney-General, and recognized by the Judge-Advocates-General of the Army. It must be satisfactory to the President, because it relieves him from private importunity and possible imposition. It is satisfactory to the officers remaining in the service, because it relieves them from the constant apprehension and danger of being jostled out of their proper places by irregular or illegal intrusion. The discharged officer cannot complain, because if it is discovered that he has been unjustly discharged he can be reappointed by and with the advice and consent of the Senate.
Some fear has been expressed lest the enforcement of this constitutional rule might disturb the position of many meri *486 torious officers now in the Army; but a careful scrutiny of the Army Register, made in the office of the Adjutant-General, removes all apprehensions on that account. The few cases recently decided by this court embrace nearly all the officers who are likely to be affected by it in any way, and none of these, with two exceptions, have been affected beyond the loss of a few months’ time.
If, on the other hand, the order of December 27,1865, remitting the sentence and reinstating the claimant, is to be considered as a pardon (and we so understand it), it comes within the rule of the common law, which is well stated by the Supreme Court in Ex parte Garland (4 Wall., 381):
“A pardon does not restore offices forfeited or property or interests vested in others in consequence of the conviction and judgment.”
So whether that order is to be considered as a revocation or a pardon, or both combined, it does not operate to restore the claimant to his former place.
We therefore hold that the time from June 1,1865, to December 27, 1865, during which the claimant was not on the Army Register, not an officer de jure nor de facto, aud performed no service whatever for the government, cannot be credited to him in calculating longevity pay.
Should he be credited with the time from December 27,1865, to March 22,1866 % During this period he was defacto in the service, though not de jure, and we hold, as we held in the cases of Bennett, Montgomery, Balen, Runkle, and Miller, above cited, that it should be counted.
We hold also, as we held ,in Montgomery’s Case (ante 370), that claimant’s appointment as captain March 22, 1866, was valid, notwithstanding he was not, in law, a first lieutenant at that date. The reasons for this conclusion, having been given at length in that case, need not be r epeated here.
By these.conclusions we credit the claimant with continuous service from January 30,1851, to the presentí time, except from June 1,'1865, to December 27, 1865. Deducting this time, his longevity pay, as shown in finding VII, has already been overdrawn.
The defendant’s counter-claim consists of three items:
First. The sum of $981.75, paid to the claimant after he was reinstated, for the time he was entirely out of the serv *487 ice, to wit, from June 1, 1865, to December 27,1865. As the claimant was neither in the Army nor rendered any service during this period, and was not entitled to demand pay, he cannot in equity and good conscience retain it. (See cases above cited.)
The second item of counter-claim consists of the sum paid claimant for his services from December 27,1865, to March 22, 1866. It amounts to $404.08. During this time he was an officer defacto, though not dejure, and was in actual service by ■order of the President. Although he was not, as the court holds, an officer de jure, and could notin a suit have recovered pay, yet after the same has been voluntarily paid for services actually rendered he cannot be called upon to refund it. This was the ruling of the court in the several cases above cited, and we see no reason to change our opinion.
The third item of counter-claim consists of the pay due the claimant June 1, 1865, and which by the sentence of the court-martial was forfeited. It amounts to $292.38, and was drawn by the claimant after the sentence was remitted.
Did the order of the President remitting the sentence reinvest the claimant with the right to demand his forfeited pay ? That a pardon does not restore property or interests vested in third parties in consequence of the consideration is well settled. Is the United States to be considered a third party, separate and distinct from the pardoning party, so as to be entitled to exemption from the claim for restoration ?
This question arose and was decided by this court in Knote’s Case (10 C. Cls. R., 397). There the claimant’s personal property had been condemned, forfeited,, and sold by a decree of the United States district court on the ground of his treason, and the proceeds paid into the Treasury. He brought suit to recover back these proceeds, alleging that by the President’s amnesty proclamation of December 25, 1868, he had been pardoned and released from all penalties, and thereby became entitled to demand the restoration of his forfeited property. The following head-note of the decision presents the opinion of the court upon this point: ■
“By the law of England, the king is lord paramount, from whom all lands are held, and treason being a breach of the condition upon which they are held, they return to the king by ■operation thereof; whence the English doctrine of the restoration of forfeitures being in the king; yet it is something dis *488 tinct from the prerogative-power to pardon, crimes, though it is vested in the same person. But the Constitution gives to Congress the power to dispose of the public property and to the President only the power to pardon crimes, and the President, having no title to forfeited property, like the king, cannot restore it, though he may pardon the offense which caused the forfeiture. Therefore property confiscated by judgment to the United States is beyond the reach of Executive clemency and is absolutely national property.”
The case was carried to the Supreme Court and affirmed. Knote v. United States (95 U. S. R., 149).
In giving the opinion of the court Justice Field says:
“ The pardon does not affect any rights which have vested in others directly by the execution of the judgment for the offense, or which have been acquired by others whilst that judgment was m force. If, for example, by the judgment, a sale of the offender’s property has been had, the purchaser will hold the property, notwithstanding the subsequent pardon. And if the proceeds of the sale have been paid to a party to whom the law has assigned them, they cannot be subsequently reached and recovered by the offender. The rights of the parties have become vested, and are as complete as if they were acquired in ahy other legal way. So, also, if the proceeds have been paid into the Treasury, the right to them has so far become vested in the United States that they can only be secured to the former owner of the property through an act of Congress. Moneys once in the Treasury can only be withdrawn by an appropriation by law. However large, therefore, may be the power of pardon possessed by the President and however extended may be its application, there is this limit to it as there is to all his powers — it cannot touch moneys in the Treasury of the United States, except expressly authorized by Congress. The Constitution places this restriction upon the pardoning power.”
Upon this subject the Judge-Advocate-G-eneral of the Army has held:
“In a case of a forfeiture, by sentence, of ‘pay due,’ the amount of pay due and payable to the party at the date of the approval of the sentence is, in contemplation of law, returned from the appropriation for the Army to the general Treasury,, and, being in the Treasury, cannot, without a violation of Art. I, sec. 9, of the Constitution, be withdrawn and restored to the party, except by the authority of Congress. A forfeiture thus executed cannot, therefore, be remitted. A sentence forfeiting pay can be remitted only as to pay not due and payable at the date of the remission.” (Dig. Op. Judge-Adv. Gen., p. 274.)
The reasoning of these cases and the authoritative ruling of the Supreme Court establish the doctrine that property or in *489 terests forfeited to and vested in the United States cannot be restored to the offender by the President’s pardon.
In the case before us the government was released by the sentence from its promise to pay the accruing salary of the claimant, and the pardon did not revive it. Congress gave the original promise, and that being extinguished, Congress alone can renew it. The money having been unlawfully paid can be recovered back on the counter-claim. The whole case sums up as follows:
Claimant was not restored to the Army by the order of the President of December 27,1865, but was so restored March 22, 1866, when he was regularly appointed captain by and with the advice and consent of the Senate.
In calculating longevity pay, the time from June 1,1865, to December 27, 1865, cannot be credited, and therefore no additional longevity pay is now due the claimant.
The defendants are not entitled to recover back the $404.08 paid claimant for services from December 27,1865, to March 22,1866, and that period of time is to be credited to him on his time of service.
The defendants are entitled to recover on their counter-claim the forfeited pay from April 1,1865, to June 1,1865, amounting to $292.38.
The defendants are also entitled to recover on their counterclaim the sum of $981.75, the amount unlawfully paid claimant for the time from June 1,1865, to December 27, 1865.
Judgment will be entered for the defendants for the sum of $1,274.13.