### LAMAR, Executor, *v.* McCULLOCH.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
SOUTHERN DISTRICT OF NEW YORK.

Argued October 15, 16, 1885.—Decided October 26, 1885.

Under § 3 of the act of July 27, 1868, ch. 276, 15 Stat. 243, now embodied in § 1059 of the Revised Statutes, in an action of trover brought against a former Secretary of the Treasury of the United States, in a court other than the Court of Claims, to recover a sum of money as the value of certain cotton alleged to have been the private property of the plaintiff, the defendant pleaded that the cotton had, in an insurrectionary State, been taken, received and collected, as captured or abandoned property, into the hands of a special agent appointed by the defendant while such Secretary, to receive and collect captured or abandoned property in that State, under § 1 of the act of March 12, 1863, ch. 120, 12 Stat. 820; that the provisions of that act were carried out in regard to the cotton, as being captured or abandoned cotton; that all the acts done by the defendant respecting the cotton were done by him through such agent, in the administration of, and in virtue and under color of, the act of 1863; and that, by force of § 3 of the act of 1863, and of § 3 of the act of 1868, the action was barred, and was exclusively within the jurisdiction of the Court of Claims. It appeared that the cotton had been taken, so far as the defendant was concerned, as being captured or abandoned property, under a claim, made by him in good faith, to that effect, in the administration of, and under color of, the act of 1863. *Held,* That, without reference to the question whether the cotton was in fact abandoned or captured property, within the act of 1863, the

fact that it was taken as being such, under such claim, made in good faith, was a bar to the action, under the act of 1868, and § 1059 of the Revised Statutes.

This was an action of trover, originally brought by Gazaway B. Lamar against Hugh McCulloch, in the Supreme Court of New York, in September, 1873, and removed into the Circuit Court of the United States for the Southern District of New York, by the defendant. The declaration was framed to recover $150,280, as the value of 578 bales of cotton, known as the Thomasville cotton, and $110,760, as the value of 426 other bales of cotton, known as the Florida cotton. The suit was afterwards discontinued as to the Thomasville cotton. The defendant pleaded (1) the general issue ; (2) that the defendant was the Secretary of the Treasury of the United States, and the 426 bales had, in the State of Florida, which had been designated as in insurrection against the lawful government of the United States by the proclamation of the President of the United States, dated July 1, 1862, 12 Stat. 1266, " been taken, received, and collected, as abandoned or captured property, into the hands of certain special agents, duly appointed by the Secretary of the Treasury to recover and collect captured or abandoned property " in said State, in pursuance of the provisions of the 1st section of the act of Congress approved March 12, 1863, ch. 120, 12 Stat. 820, and the acts amendatory thereof and supplementary thereto : that " all the other provisions of said act of Congress were carried out in regard to said bales of cotton, as being captured or abandoned cotton ; " that all acts done by the defendant " respecting said cotton, were done by him through the agents aforesaid, as such officers of the United States as aforesaid, and in the administration of, and in virtue and under color of, the aforesaid acts of Congress ; " and that, by force of § 3 of the said act of March 12, 1863, and § 3 of the act of Congress approved July 27, 1868, ch. 276, 15 Stat. 243, the plaintiff " has no legal cause of action herein, but is barred from such action, which, by force of the statutes aforesaid, is exclusively within the jurisdiction of the Court of Claims ; " (3) that this action is brought against the defendant " for or on account of private property taken by

him as an officer or agent of the United States, in virtue or under color of" said act of March 12, 1863, and the acts amendatory thereof and supplementary thereto; that the acts done by the defendant, "in regard to said private property, were done by him as an officer or agent of the United States, in the administration of, and in virtue and under color of, said act" of March 12, 1863, and said acts amendatory thereof and supplementary thereto; and that, by force of § 3 of said act of July 27, 1868, the plaintiff has no legal cause of action against the defendant. There were other pleas to which it is not necessary to refer.

To the general issue the plaintiff put in a similiter. To the second plea he put in two replications: (1) that the defendant seized and detained the cotton mentioned in the plea in his own wrong and without the cause alleged, concluding to the country; (2) that the cotton was not property abandoned or captured in the State of Florida, "and had not been taken, received and collected, as abandoned or captured property, into the hands of special agents duly appointed by the Secretary of Treasury to receive and collect captured and abandoned property" in said State, in pursuance of the statutes cited, and was "not seized by any agent or officer of the United States as such abandoned or captured property, and that all acts done" by the defendant "respecting the said cotton, were not done by him through the agents aforesaid, as the Secretary of the Treasury of the United States, and in the administration of, and in virtue and under color of," the acts of Congress set forth in the plea, concluding to the country. To the third plea the plaintiff replied, that the cotton was not private property taken by the defendant "as an officer or agent of the United States, in virtue or under color of" the acts of Congress mentioned in the plea; and that the acts done by him in regard to the cotton "were not done by him as an officer or agent of the United States, in the administration of, and in virtue and under color of," said acts of Congress, concluding to the country.

To these replications the defendant put in similiters. The case was at issue in March, 1874. In October, 1874, Mr.

Lamar died, and, the present plaintiff having been appointed and qualified as his executor in November, 1874, an order was made in November, 1875, continuing the action in his name as executor. The cause was tried before a jury in November, 1884. At the close of the plaintiff's evidence, and without any evidence being put in by the defendant, the court directed the jury to find a verdict for the defendant, "upon the ground that the Court of Claims had exclusive jurisdiction of the cause of action set forth in the plaintiff's declaration, and in the evidence as given thereunder, by virtue of the statute of March 12, 1863, and the statutes passed amendatory thereof." The plaintiff excepted to this ruling, and a verdict was rendered for the defendant, followed by a judgment in his favor, to review which the plaintiff brought this writ of error.

The case made out by the plaintiff by his evidence set forth in the bill of exceptions, as applied to the pleadings above set forth, was this, so far as such evidence is material, in the view which the court takes of the case:

On the 16th of November, 1865, one Samuel G. Cabell, being in Washington, addressed to the defendant, who was then the Secretary of the Treasury of the United States, a written application or petition, asking for compensation for certain services performed by him "in collecting and securing for the government of the United States certain captured property therein enumerated." No copy of this letter is put in evidence, and its tenor is to be gathered from subsequent correspondence.

On the 17th of November, 1865, the defendant sent to Mr. Cabell the following letter:

"TREASURY DEPARTMENT, *November 17th*, 1865.

SIR: I have received your application for compensation for certain services performed by you under an appointment from J. H. Alexander, Esq., ass't special agent at Pensacola and Apalachicola, Fla., in collecting and securing for the Government of the United States certain captured property therein enumerated.

In fixing the amount of your compensation Mr. Alexander

transcended his authority, and promised you an amount larger than has been approved by me in any case, and much larger, in my opinion, than the circumstances in these cases would justify. Nor does it appear that the property in question has been actually placed in possession of any agent of this Department, or in fact removed from the places where it was discovered. In view, however, of the stipulations made by Mr. Alexander and services you have performed and will still be able to perform for the Department in connection with the collection of this property, I desire that you return to your late field of operations and do all in your power to secure to the Government the cotton named by you, and to transport the same to a proper place of shipment at the earliest practicable day; and I will agree to make such an allowance as compensation for your services as will be liberal and just, in view of the character of your services and the risk and expenses incurred by you in performing them. To this end it will be necessary for you to keep accurate accounts and a full history of all the facts connected with all lots of cotton so secured and delivered by you.

Please acknowledge the receipt hereof, and advise me whether the proposition herein made will be accepted by you.

Very respectfully,    H. McCulloch,
S. G. Cabell,               *Secretary of the Treasury.*
     Acting Aid to Ass't Sp'l Agent
         Treas'y Dep't, Ninth Special Agency."

On the 18th of November, 1865, Mr. Cabell replied as follows:

"WASHINGTON, D. C., *Nov.* 18*th*, 1865.

Hon. Hugh McCulloch, Secretary of the Treas'ry.

SIR: I am in receipt of your communication of the 17th of Nov. authorizing me to return to my late field of operations in Florida and Southern Georgia, and to do all in my power to secure to the Government the cotton named in my communication of the 16th of November, and I hereby signify my acceptance of your proposals.

Before leaving the city I would desire further instructions as to the mode of paying the necessary expenses to be incurred in bringing the said cotton to a proper place of shipment, and to whom I am authorized to turn the cotton over.

In your communication no mention is made of my claim for compensation for collecting or securing the cedar timber and the cattle named in my petition, and I understand that decision upon these matters has been deferred.

I am, very respectfully, your ob'd't serv't,

S. G. CABELL."

On the 11th of December, 1865, Mr. Cabell sent to the defendant the following letter:

"TALLAHASSEE, FLORIDA, *December, 11th*, 1865.

Hon. H. McCulloch, Secretary of the Treasury.

SIR: I have the honor to report that, agreeable to your orders contained in your letter of Nov'r, 17th ult., I have already shipped to Jacksonville, for shipment to New York, one hundred and seventy bales of cotton, a part of the lot formerly owned by the Exporting and Importing Company, and am engaged preparing the balance for shipment.

I have the honor to report that I proceeded to Thomasville, Georgia, and to carry out your instructions relative to the cottons at that point and vicinity, estimated at over fifteen hundred bales, and specified in my petition to which your letter of the 17th of November was an answer, and found that the cotton was being shipped by Mr. Browne, special agent of the 5th district, upon whom I made a demand for the cottons, who refused to allow me to touch a bale of the cotton, and I was refused assistance from the military commander at that post, on the ground that he had no authority in the premises. I have respectfully to state that I served, in writing, notices upon the holders of this cotton, and was the party by whose aid the Government did finally come into the possession of the same.

I have to respectfully ask that the said special agent, Browne, be ordered to allow me to carry out my orders contained in

your letter of Nov'r 17th, and that he be required to make a report as to what disposition he has made of any part of said cotton, and that the military be ordered to aid me in guarding the same, and such other assistance as they may be able to render.

I have the honor to be, very respectfully, your ob't serv't,

S. G. CABELL,
*Acting Agent, Treasury Dep't."*

The defendant replied to this letter as follows, on the 29th of December, 1865:

"TREASURY DEPARTMENT, *December 29th,* 1865.

SIR: I have received your letter of the 11th instant, advising me that, in accordance with my instructions of Nov. 17th, you had shipped to Jacksonville, for shipment to New York, 170 bales of cotton, being part of a lot formerly owned by the Exporting and Importing Company, and that you are engaged in preparing the balance for shipment; also, that you visited Thomasville, Ga., in relation to the cotton at that point, and found that it was being shipped by Mr. Browne, supervising sp'l agent 5th agency, upon whom you made a demand for the cotton, and that he refused to allow you to touch a bale of it; stating, also, that you were the party by whose aid the Government finally came into possession of it, and asking that Mr. Browne be ordered to allow you to carry out the instructions referred to, &c., &c.

My letter of Nov. 17th to which you refer, was not intended to authorize you to take possession of any cotton which might be found in the hands of a duly authorized agent of the Department, but was intended rather that you should co-operate with such agents, and to empower you to take into your possession any cotton belonging to Government not in the custody of any other officer of the Department, and which might not otherwise be secured by them.

Inasmuch as it appears, by the records in this department, that the cotton at Thomasville was turned over to Mr. Browne

by the military authorities in August last, and regularly receipted for by him, I must decline to comply with your request to direct him to turn it over to you.

Mr. Browne has made a representation of the matter to the Department, from which it appears that you have assumed to authorize other persons 'to seize all the cotton, tobacco, and other property which heretofore belonged to the so-called Confederate Government.' A perusal of my letter to you of Nov. 17th will show that no authority to appoint subordinates was delegated to you; nor was it intended to do more than secure your services in connection with the lots of property specified by you. No indiscriminate seizures or collections were contemplated by it; you will, therefore, withdraw any such appointments you may have given, and conform your general action accordingly.

Relative to the instructions asked for in your communication of the 18th ult., I have to say, as to the mode of paying the necessary expenses incurred in bringing cotton to a proper place of shipment, that such expenses should be paid by the vessel transporting it to New York, and the same should follow the cotton as charges, to be paid by the United States cotton agent in New York. It is thought that any vessel desiring to secure the freight will make this arrangement.

It is proper to add here that it is not necessary that the shipments of cotton to New York should be made by you. The spirit of my instructions will be carried out as well by your delivering it to any authorized agent near where the same may be found, or at the place of shipment, and your compensation will be allowed accordingly.

Your letter of the 11th instant conveys no specific information in regard to where the cotton referred to was found, nor to whom or by what vessel or conveyance the same was shipped. In this connection I desire to call your attention to that paragraph of my letter of Nov. 17th requiring you to keep accurate accounts and a full list of all the facts connected with any lots of cotton secured and delivered by you. A copy of this record and history should be forwarded to the Department immediately on the shipment of any lot, and a copy

should also be furnished to the agent to whom it is turned over or consigned.

Very respectfully,

H. McCULLOCH,
*Secretary of the Treasury.*

S. G. Cabell, Esq.,
Acting Aid Treasury Department, Tallahassee, Fla."

On the 17th of February, 1866, Mr. Cabell, being in Washington, sent to the defendant a letter, in which he said:

"WASHINGTON, D. C., *February 17th*, 1866.
Hon. Hugh McCulloch, Sec'y of Treasury.

SIR: In accordance with your letter of the 17th Nov'r last, requesting me to return to my late field of operations in Florida and Southern Georgia, and to do all in my power to secure to the Government the cotton mentioned in my communication to you Nov'r 16th last, I have now the honor to make the following report:

As will be seen by an official transcript of the books of the 'custom-house,' Jacksonville, Fla., collector's office, January 25th, 1866, and herewith submitted, marked 'Exhibit A,' I shipped on board the brig Lewis Clark one hundred and seventy-seven (177) bales of cotton, weighing ninety-two thousand one hundred and one (92,101) pounds; also shipped on board the schooner Queen of the West, ninety-five (95) bales of cotton, weighing forty-eight thousand three hundred and twenty-one (48,321) pounds, all of which cotton was marked 'U. S.,' and consigned by me to Simeon Draper, Esq., cotton agent, New York City.

The above-mentioned cotton which was seized by me, &c., was owned by the Exporting and Importing Company of Georgia, (president, G. B. Lamar,) a company engaged in the sole business of blockade running, and holding said property for the purpose of aiding and abetting the rebellion, as stated in my communication to you of the 16th Nov. last.

Most of the cotton purchased for the above company in Florida and Southern Georgia was made by one who signs

himself as 'W. W. Cheever, agent for G. B. Lamar,' as will more fully hereafter appear when reference is made to certain lots of cotton by me seized and shipped. It also appears that the said cotton was purchased by the agents of Mr. Lamar and left on the plantation subject to their order."

This letter proceeded to give an account of the various lots of cotton making up the 272 bales, stating where in Florida they were seized or taken by Mr. Cabell, and transmitting various documents, and, among them, an account showing that he had paid out $6,654, as expenses relative to the cotton, before it was shipped to New York. The letter said: "It will thus be seen, from the papers submitted, that I have been engaged since July last, in seizing and otherwise obtaining this two hundred and seventy-two (272) bales of cotton for the Government;" and concluded with asking as compensation for the services, one-third of the cotton, or 90⅔ bales.

On the 27th of February, 1866, Mr. Cabell presented to the Treasury Department a petition, setting forth that, on the 22d of July, 1865, J. H. Alexander, then acting assistant supervising special agent of the United States Treasury Department for the 9th special agency, "under the regulations of said Department for the collection of captured and abandoned property in the disloyal States," had appointed Mr. Cabell acting aid to the assistant special treasury agent for the District of Florida, "to collect and receive all the cotton, tobacco and other property belonging to the United States;" that, in July, 1865, one Douglas shipped from Tallahassee to one Ottman, a reputed treasury agent at Jacksonville, Florida, 268 bales of "government cotton," which Mr. Cabell then claimed were taken from his district and should of right be under his control; and that, in August, 1865, Mr. Cabell paid the expenses of preparing the cotton for shipment, which Ottman had not paid, being $6,883.89. The petition prayed that Mr. Cabell be paid the $6,883.89, and be allowed compensation for his services in the matter.

On the 4th of May, 1866, the defendant sent the following letter to Mr. Draper, the United States cotton agent at New York:

" MAY 4, 1866. ·

SIR: Application is made to me by S. G. Cabell, Esq., for the allowance to him of a portion of certain two hundred and seventy-two (272) bales of cotton collected by him, and shipped to you from Jacksonville, Fla., on the 25th of January last, and for a portion also of certain two hundred and sixty-eight (268) bales alleged to have been collected by him and turned over or shipped to Reuben Ottman, Esq., assistant special agent at Jacksonville, Fla.

I am not at present prepared to make a division of either lot, but it appearing to my satisfaction that Mr. Cabell has paid, as expenses incidental to securing the first lot, the sum of six thousand six hundred and fifty-four dollars ($6,654), and on the second the sum of six thousand eight hundred and eighty-three dollars and eighty-nine cents ($6,883.89), which amounts should properly be reimbursed, you are hereby authorized and directed to pay to his attorneys, Messrs. Hughes, Denver & Peck, the two amounts named, charging the first as an item of expense against the two hundred and seventy-two bales above referred to, and the second as a similar item against the shipment of cotton received by you from Mr. Ottman at Jacksonville.

Mr. Cabell also asks a per diem allowance as a compensation for his time, personal services, and expenses in connection with the cotton named; for this purpose you are also authorized and instructed to pay his attorneys, Messrs. Hughes, Denver & Peck, the sum of three hundred and fifty dollars ($350), being at the rate of five dollars ($5) per day from the 17th of Nov. last, the date of my letter authorizing him to take action in the premises, to the 25th of January, the date of the shipment by him of the two hundred and seventy-two (272) bales mentioned, from Jacksonville, making a charge of this amount, also, as an item of expense against the two hundred and seventy-two (272) bales.

These several sums should be charged against Mr. Cabell on your books, and will be deducted from any portion of cotton hereafter allotted, or any allowance made to him, on a final settlement of his claims.

You will, of course, require proper receipts for the money thus paid, and promptly report your action hereunder to the Department.

Very respectfully,          H. M'CULLOCH,
*Secretary of the Treasury.*

Simeon Draper, Esq., U. S. Cotton Agent, New York."

The $13,887.89 was paid by Mr. Draper May 7, 1866. The 272 bales of cotton were sold at auction by Mr. Draper, at New York, September 12, 1866, and produced the net sum, above expenses of sale, of $28,792.19, which sum was paid into the Treasury of the United States. When the 268 bales were sold does not appear, but the net proceeds of it, at New York, above expenses, appear to have been $42,883.76, and it is assumed they were paid into the Treasury.

On the 25th of May, 1867, the defendant sent to the Commissioner of Customs the following letter:

"MAY 25, 1867.

SIR: In compliance with the promise made to him in my letter of November 17th, 1865, I have decided to pay Mr. Samuel G. Cabell, as full compensation for information furnished, services performed, and expenses incurred by him, in the collection, putting in order and shipment to New York of certain 272 and 268 bales of cotton, ex brig Lewis Clark, and schooners Queen of the West, Julia Crawford, and R. E. Pecker, etc., and for information furnished and expenses incurred by him touching the cottons captured at Thomasville, Ga., and other cottons claimed by the Georgia Exporting and Importing Company, or by G. B. Lamar, and held by Government as captured or abandoned property, the sum of four thousand eight hundred and eighty-one dollars and ten cents ($4,881.10).

You will, therefore, please issue your requisition upon F. E. Spinner, Esq., Treasurer, U. S. special agent, the same to be satisfied out of any funds in his hands as proceeds of captured and abandoned property, for the amount named, viz., $4,881.10, in favor of George Peabody Este, whose full power of attorney to act in the premises is on file in this office.

The draft therefor when issued, should be handed to Mr. S. H. Kauffmann, a clerk in this office, for delivery to the payee, under such instructions relative thereto as he may have or receive.

Very respectfully,      H. M'CULLOCH,<br>
*Secretary of the Treasury.*

Nathan Sargent, Esq're, Commissioner of Customs."

This settlement was made on the basis of giving to Mr. Cabell one-fourth part of the gross value of the cotton as sold at New York, and deducting therefrom the $6,654 and the $6,883.89, and also one-fourth part of the expenses on the cotton before its shipment at Jacksonville, and for its transit from there to New York, and at New York, and adding $500 in respect of the Thomasville cotton, making a total allowance of $4,881.10, which sum was paid to Mr. Este, for Mr. Cabell, by Mr. Spinner, as special agent, by a draft on the Treasurer of the United States, May 27, 1867.

*Mr. George Ticknor Curtis* [*Mr. Edward N. Dickerson* was with him on the brief] for plaintiff in error.—There was no military seizure or capture of Lamar's cotton, or any part of it, either as his individual property or as the property of any company. Without actual military seizure, constructive capture resulting from military occupation of the district was not a capture under the Abandoned and Captured Property Acts. *United States* v. *Padelford,* 9 Wall. 531; *United States* v. *Klein,* 13 Wall. 128, 136; *Lamar* v. *Brown,* 92 U. S. 187. Before the seizure of the cotton, Lamar had taken the amnesty oath. The proclamation of December 8, 1863, in and of itself, granted a full pardon to all persons who had, directly or by implication, participated in the existing rebellion, with certain exceptions, none of which ever applied to Mr. Lamar, with restoration of all rights of property except as to slaves, and in property cases where rights of third parties had intervened, on condition of their taking and keeping the prescribed oath. The following cases establish that the pardon purged the offender of all personal guilt and incapacity, and made him a

new man; and likewise purged his property of all previous causes of forfeiture not arising out of any actual use to which he had in fact put it, and not enforced before the time of the pardon. (1866) *Ex parte Garland*, 4 Wall. 333; (1867) *Amstrong's Foundry*, 6 Wall. 766; (1869) *United States* v. *Padelford*, 9 Wall. cited above; (1871) *United States* v. *Klein*, 13 Wall. cited above; (1871) *Armstrong* v. *United States*, 13 Wall. 154.

The plaintiff, at the trial, took some exceptions to the rulings of the court on the rejection of evidence, but on this writ of error these are not very material. The substantial and important error is the peremptory direction to the jury to find a verdict for the defendant upon the ground that the Court of Claims had exclusive jurisdiction of the cause of action set forth in the plaintiff's declaration, and in his evidence given thereunder, by virtue of the statute of March 12, 1863, and the statutes amendatory thereof. We now make the following points of law:

I. The action being for a personal tort, it was error for the presiding judge to rule that the case made by the plaintiff's declaration, and supported by his evidence, was one for the exclusive jurisdiction of the Court of Claims, because the foundation and indispensable element of the Court of Claims' jurisdiction, namely, military capture or seizure, transfer of the property from the military authority to the civil agent, and his receipt therefor, were utterly wanting.

II. It was error in the presiding judge to rule as he did, because, on the fact that Lamar had taken the amnesty oath six months before there was any seizure, and on the evidence which proved the defendant's knowledge of that fact before he finally adjusted and paid Cabell a large part of the proceeds of Lamar's cotton, thereby ratifying and confirming the original seizure and removal, the plaintiff had an absolute right to have the verdict of the jury taken on the effect of the amnesty oath, under an instruction that the plaintiff's property was everywhere exempt from such a seizure as that made by Cabell under authorization derived from the defendant. The ruling of the presiding judge not only caused the inconvenience of and

necessity for a new trial, but it shut out a fact which of itself lay at the foundation of the personal action of tort, inasmuch as it showed, under all the circumstances, that the original seizure was a gross wrong, and that its ratification and adoption by the defendant were made with knowledge that Lamar had taken the oath.

III. It was error for the presiding judge to rule as he did, because there was no evidence in the case that the cotton was ever the property of the Exporting and Importing Company, or was purchased and held by Lamar with intent to transfer it to that company, or that it was any one's property but his. On the theory that it might turn out to have been the property of that company, or was purchased and held by Lamar to aid the rebellion, the foundation of the Court of Claims' jurisdiction was entirely wanting on the facts proved at the trial, because those facts showed that whoever was the owner, or with whatever intent the property was purchased, there had been no military capture, seizure, custody, possession or control. The Court of Claims could not take jurisdiction of a case where the seizure, custody and control had been that of a civil agent alone, from beginning to end.

IV. It was error in the presiding judge to rule as he did, because, although the property of Lamar in Florida may have been liable to capture by the Federal forces in September, October and November, 1865—so as to have made a case for the jurisdiction of the Court of Claims, and to have made him remediless save in that court—it was not liable to be taken by any civil agent of the treasury without such capture, or to be collected by such agent, even if there had been a capture. On the 24th of June, 1865, President Johnson issued a proclamation, concerning removal of restrictions on commercial intercourse. 13 Stat. 769. Three days later, on the 27th of June, 1865, a Treasury circular letter of instructions relative to commercial intercourse, captured, abandoned and confiscable property, freedmen, &c., was issued. It first directed as follows: " The various rules and regulations heretofore prescribed by the Secretary of the Treasury, in regard to the above named subjects, having been rendered nugatory in whole or in part by the

changed condition of affairs in the Southern States, and executive orders and proclamations, and the War Department having assumed charge of freedmen, abandoned lands, &c., under the provisions of the act of Congress approved March 3, 1865, the following instructions as to the duties of officers of the Treasury Department in the premises are prescribed, and will be regarded as in full force and effect immediately on the receipt thereof." Then, among other things, it provided as follows: "4. Officers of this Department charged with the duty of receiving or collecting, or having in their possession or under their control captured, abandoned or confiscable personal property, will dispose of the same, in accordance with regulations on the subject heretofore prescribed, at the earliest time consistent with the public interests, and will refrain from receiving such from military or naval authorities after the 30th inst. This will not be construed, however, as interfering with the operations of the agents now engaged in receiving or collecting the property recently captured by or surrendered to the forces of the United States, whether or not covered by or included in the records, etc., delivered to the United States military or Treasury authorities, by rebel military officers or cotton agents. Those so acting will continue to discharge the duties thus imposed until such property is all received or satisfactorily accounted for, and until the amount so secured is shipped or otherwise disposed of under the regulations on the subject heretofore prescribed. And they will use all the means at their command, with the utmost vigor, to the end that all the property so collected, captured or turned over shall be secured to the United States with the least possible cost and delay.

"After the 30th instant, the duty of receiving captured and abandoned property not embraced in the above exception, will be discharged by the usual and regular officers of the customs, at the several places where they may be located, in accordance with regulations relating to the subject; and officers heretofore performing that duty will give them all the aid and information in their power to enable them to carry out the same."

It has never been explained how, consistently with the above cited proclamation and circular, the Secretary of the Treasury

could lawfully give to Cabell the authorization which was given by his letter of November 17, 1865, in respect to the cotton named by Cabell in his communication of November 16. On the facts, as they stood at the trial of this action, upon the plaintiff's evidence, this cotton was Lamar's private property; it had never been captured at any time; it did not come within any of the predicaments in which the Treasury agents were authorized by the circular to continue to act after June 30, 1865; it was the property of a man who had taken the amnesty oath six months before the seizure, and who, under both the proclamation and the circular, had a perfect right to ship it to a Northern market, or any part of the world, or to hold it where it was, unless it should have been captured by the military forces then occupying Florida. Cabell, and every other Treasury agent, was *functus officio* as to any authority to make a fresh seizure after the 30th of June, 1865, or to collect property from the military authorities which he was not then engaged in collecting; and his employment in November, 1865, to make a special seizure of Lamar's cotton, must be taken to have been an employment not as a public officer of the government under the Abandoned and Captured Property Acts, but as a personal agent of the defendant.

V. The presiding judge erred in ruling as he did, because the question whether the defendant executed the Abandoned and Captured Property Acts was not a mere question of law, but was a mixed question of law and fact. If the district attorney did not choose to offer any evidence on this or any other issue in the case, it was still the duty of the presiding judge to put the plaintiff's evidence to the jury, on a proper instruction as to what would constitute an execution of those acts, and would make a case for the exclusive jurisdiction of the Court of Claims.

VI. Two limitations were pleaded: one of six years under the law of New York, the law of the forum where the action was brought; the other one of two years under the act of March 3, 1863, "relating to habeas corpus, and regulating judicial proceedings in certain cases." 12 Stat. 755. The section referred to is as follows:

"SEC. 7. *And be it further enacted*, That no suit or prose-cution, civil or criminal, shall be maintained for any arrest or imprisonment made, or other trespasses or wrongs done or committed, or act omitted to be done, at any time during the present rebellion, by virtue or under color of any authority derived from or exercised by or under the President of the United States, or by or under any act of Congress, unless the same shall have been commenced within two years next after such arrest, imprisonment, trespass, or wrong may have been done or committed or act may have been omitted to be done; *Provided*, That in no case shall the limitation herein provided commence to run until the passage of this act, so that no party shall, by virtue of this act, be debarred of his remedy by suit or prosecution until two years from and after the passage of this act."

We suppose that all statutes of limitations of personal actions, especially of actions of tort against public officers, are to be construed and applied by the principle that their operation is suspended when the defendant is not within the reach of process. In reference, therefore, to the two years' limitation, we contend: 1st. That it has no application to a case in which a public officer did not act within the scope of his delegated powers, but acted wholly aside from them. Unless this court can now hold, contrary to its decision, in *Lamar* v. *Browne*, 92 U. S. 187, that previous military capture or seizure was not an essential element in the powers delegated to the Secretary of the Treasury under the Abandoned and Captured Property Acts, the seizure which was made was a naked trespass, and to such a cause of action Congress cannot have intended to interpose a limitation of two years simultaneously operative everywhere throughout the United States. 2d. That if the two years' limitation is applicable to this case, the action was brought seasonably.

*Mr. Attorney-General* for defendant in error.

MR. JUSTICE BLATCHFORD delivered the opinion of the Court. After stating the facts in the language above reported, he continued:

The foregoing written documents show the connection of the defendant with the case. Mr. Cabell's application or petition of November 16, 1865, claimed compensation for having collected or secured cotton, cedar timber, and cattle. It enumerated the property. The defendant, in his letter of November 17, 1865, to Mr. Cabell, refers to it all as "captured property," but says that as none of it had been actually placed in the possession of any agent of the Treasury Department, or removed from the places where it had been discovered, he desires that Mr. Cabell will return South and do all in his power "to secure to the government the cotton named" by him, and "to transport the same to a proper place of shipment." Only cotton was to be secured; and it is a fair interpretation of the letter, that the cotton was to be secured as having been "captured property," and that it was referred to by the defendant as part of the "captured property" enumerated by Mr. Cabell. Mr. Cabell, in his letter to the defendant of December 11, 1865, speaks of the 170 bales he had already shipped as cotton "formerly owned by the Exporting and Importing Company." The defendant, in his letter to Mr. Cabell of December 29, 1865, says that his letter of November 17, 1865, was intended to empower Mr. Cabell to take into his possession "any cotton belonging to government not in the custody of any other officer of the department, and which might not otherwise be secured by them;" that a perusal of that letter will show that it was not intended to do more than secure his services in connection with the lots of property which had been specified by him; and that "no indiscriminate seizures and collections were contemplated by it." Mr. Cabell's letter to the defendant of February 17, 1866, says that the 272 bales he had shipped from Jacksonville to New York on January 25, 1866, were "owned by the Exporting and Importing Company of Georgia (President, G. B. Lamar), a company engaged in the sole business of blockade running, and holding said property for the purpose of aiding and abetting the rebellion." In his petition of February 27, 1866, to the defendant, Mr. Cabell states that he had been appointed by Mr. Alexander, in July, 1865, to "collect and receive all the cotton, tobacco, and

other property belonging to the United States," and speaks of the 268 bales as "government cotton," and speaks of Mr. Alexander as agent of the Treasury Department, "under the regulations of said department for the collection of captured and abandoned property in the disloyal States." In his letter of May 25, 1867, to Mr. Sargent, the defendant speaks of the 272 and 268 bales as being "held by government as captured or abandoned property," and directs the $4,881.10 to be paid out of the "proceeds of captured and abandoned property."

By § 1 of the act of March 12, 1863, ch. 120, 12 Stat. 820, the Secretary of the Treasury was authorized to appoint special agents "to receive and collect all abandoned or captured property" (with specified exceptions), in any State designated as in insurrection by the proclamation of the President of July 1, 1862, 12 Stat. 1266. Florida was such a State. By § 2, the property collected, if not appropriated to public use, was to be forwarded to a place of sale in the loyal States, and sold at auction, and the proceeds paid into the Treasury of the United States. By § 3, the Secretary of the Treasury was to cause "books of account to be kept, showing from whom such property was received, the cost of transportation, and proceeds of the sale thereof." Section 3 further provided as follows: "And any person claiming to have been the owner of any such abandoned or captured property may, at any time within two years after the suppression of the rebellion, prefer his claim to the proceeds thereof in the Court of Claims; and on proof to the satisfaction of said court of his ownership of said property, of his right to the proceeds thereof, and that he has never given any aid or comfort to the present rebellion, to receive the residue of such proceeds, after the deduction of any purchase money which may have been paid, together with the expense of transportation and sale of said property, and any other lawful expenses attending the disposition thereof."

By § 3 of the act of July 27, 1868, ch. 276, 15 Stat. 243, it was declared to have been the true intent and meaning of the act of March 12, 1863, "that the remedy given in cases of seizure made under said act, by preferring claim in the Court of Claims, should be exclusive, precluding the owner of any

property taken by agents of the Treasury Department as abandoned or captured property, in virtue or under color of said act, from suit at common law, or any other mode of redress whatever, before any court or tribunal other than said Court of Claims; and in all cases in which suits of trespass, replevin, detinue, or any other form of action may have been brought and are now pending, or shall hereafter be brought, against any person, for or on account of private property taken by such person as an officer or agent of the United States, in virtue or under color of the act aforesaid," "the defendant may and shall plead or allege, in bar thereof, that such act was done or omitted to be done by him as an officer or agent of the United States, in the administration of one of the acts of Congress aforesaid, or in virtue or under color thereof, and such plea or allegation, if the fact be sustained by the proof, shall be, and shall be deemed and adjudged in law to be, a complete and conclusive bar to any such suit or action."   This statute was in force when this suit was brought, and when the issues in it were joined, and the provision as to the jurisdiction of, and exclusive remedy in, the Court of Claims, is re-enacted, in substance, in § 1059 of the Revised Statutes, which gives jurisdiction to the Court of Claims to hear and determine all claims for the proceeds of captured or abandoned property, as provided by the act of March 12, 1863, or by the act of July 2, 1864, ch. 225, 13 Stat. 375, and then adds: "*Provided,* That the remedy given in cases of seizure under the said acts, by preferring claim in the Court of Claims, shall be exclusive, precluding the owner of any property taken by agents of the Treasury Department as abandoned or captured property, in virtue or under color of said acts, from suit at common law, or any other mode of redress whatever, before any court other than said Court of Claims."

The occasion for the enactment of the provisions of § 3 of the act of July 27, 1868, appears to have been this: One Elgee brought a suit in a State court in Missouri, against one Lovell, to recover the possession of some bales of cotton.  Lovell removed the case into the Circuit Court of the United States for the Districts of Missouri, on the ground that he was in posses-

sion of the cotton as agent for the government of the United States, which claimed it as abandoned property, under the act of March 12, 1863. Elgee having died, the suit was continued in the name of his administrator. It was decided by the Circuit Court, held by Mr. Justice Miller and District Judges Treat and Krekel, in October, 1865, and is reported in 1 Woolworth, 103, as *Elgee's Administrator* v. *Lovell.* The opinions of the court, for there were two, were given by Mr. Justice Miller. To the ordinary declaration in detinue the defendant pleaded that the cotton had, before the suit was brought, and in March, 1864, been taken, received and collected, in the State of Mississippi, as abandoned property, into the possession of one Hart, a special agent, appointed by the Secretary of the Treasury to receive and collect abandoned or captured property, under the act of March 12, 1863, Mississippi having been designated as in insurrection, by the proclamation of July 1, 1863; that the cotton was in possession of the defendant, at St. Louis, as agent of the United States, in its transit to a place of sale, and he was holding it for and on behalf of the United States, and not otherwise; and that the cotton was claimed by the United States as abandoned property, under said act. The plaintiff demurred to this plea, and the demurrer was overruled. The Circuit Court said, in regard to the plea: "It shows that the cotton mentioned in the declaration was seized as abandoned property, in one of the districts declared by the proclamation to be in a state of insurrection, by a special agent of the Treasury Department for that district; and that, when this suit was brought, it was held by the defendant as an agent of the government, with the view of disposing of it under the act. The objection taken to it is, that it does not aver that the property, when taken possession of by the Treasury agent, was captured or abandoned property, nor in any other manner show that it was rightfully seized. . . . The question is, whether Congress intended to make the remedy given by this act exclusive of all others, or to permit the Treasury agents to be sued for the possession or proceeds of such property wherever the party aggrieved might find a court of general jurisdiction. . . . The act evidently contemplates, that, in some instances, at

least, property will be seized which ought to be returned to its owner, or for which compensation should be made by paying him the proceeds. Otherwise it were unnecessary to provide any means of determining when a return should be made. And the remedy applies to property taken by mistake, or by the unjustifiable act of the agent, equally as to property which has been abandoned or captured. . . . I am of opinion that Congress intended to prescribe to all claimants who should prove their loyalty and their right to the property, this remedy for all cases of seizure by agents under this law, whether made in strict accordance with its provisions or not." Upon this decision, the plaintiff filed a replication to the plea, which averred that the cotton, before it came into the possession of Hart, was the property of Elgee; that, by the proclamation of the President, of December 8, 1863, 13 Stat. 737, there was promised a full pardon and amnesty, with restoration of all their rights of property, except as to slaves, to all those living in the insurrectionary districts, except certain classes of persons therein mentioned, who should thereafter take, subscribe and keep inviolate a certain oath therein prescribed; that, before the suit was brought, Elgee, then living in said insurrectionary districts, not being one of the excepted persons, took and subscribed the oath required and had kept it inviolate; and that his rights of property in the cotton were thereby restored to him. The defendant demurred to this replication. The demurrer was sustained by the Circuit Court, which held, in its decision, that, as the act of March 12, 1863, contemplated that the property of loyal citizens might and would be taken under it, and as the only remedy of a loyal citizen of a loyal State in respect to property owned by him, seized by a Treasury agent, in an insurrectionary district, as abandoned property, was by an application to the Court of Claims, pardon and amnesty could not place the disloyal citizen in any better position than that occupied by the loyal citizen.

There was a final judgment against the plaintiff, and the case was brought into this court by a writ of error sued out by Elgee's administrator, and was No. 63 on the docket of

December Term, 1867.  Briefs for both parties were filed, and the case was argued orally.  The court was equally divided in opinion, eight judges sitting, and the judgment was consequently affirmed, on the 27th of January, 1868.  Subsequently, the bill which became a law on the 27th of July, 1868, was introduced into the House of Representatives, and passed by it and by the Senate, and was approved by the President.  It is proper to assume, from this history and the contents of the act, that it was introduced and passed because of the difficulties which had attended the decision of this court in the Elgee case.

It is manifest, we think, that § 3 of the act of July 27, 1868, was intended to cover, and does cover, a case like the present. The act, in terms, includes a suit for what is in fact private property, taken by an agent of the United States as being abandoned or captured property, in the administration of the act of March 12, 1863, or in virtue thereof, or under color thereof.  Whatever doubt there may have been before the act of July 27, 1868, was passed, on facts such as those in Elgee's case, there can be none as to this case, on its facts, under the language of that act.  Even though the property taken was private property, if it was taken by an officer or agent of the United States, under a claim that it was abandoned or captured property, in the administration of the act of March 12, 1863, or in virtue thereof, or under color thereof, the jurisdiction of every court but the Court of Claims, in respect to every mode of redress, is taken away, when it is pleaded or alleged in defence that the property was taken by the defendant, as such officer or agent, in the administration of the act, or in virtue or under color thereof, and that fact is sustained by the proof.  The fact to be sustained by the proof is, not that the property was in fact abandoned or captured property, but that it was in fact taken as being such, on a claim to that effect, in the administration of the act, or in virtue of it, or under color of it.  Of course, there must be good faith, or there can be no color.  The claim must not be made in bad faith.  In *McLeod* v. *Callicot*, Chase's Decisions, 443, Chief Justice Chase, in speaking of § 3 of the act of July 27, 1868, says, that, if a

person proceeds in good faith, believing himself to be warranted, as an officer of the government, in taking charge of property under the act, he is covered by its provisions; and that, in such case, although the acts he does as such officer are done under a mistake as to the character of the property, he is protected by the act against a private suit. This we believe to be the proper interpretation of the statute. In *Lammon* v. *Feusier*, 111 U. S. 17, where a marshal, having an attachment against the property of one person, levied it on the property of a stranger, it was held by this court that the sureties on the official bond of the marshal were liable to the stranger, because the marshal had acted *colore officii*, although he had acted without sufficient warrant.

This suit is not against Mr. Cabell. No accusation of bad faith against Mr. Cabell can affect the defendant, except so far as the acts of Mr. Cabell were authorized in advance by the defendant, or sanctioned or approved or ratified by him with full knowledge. Starting out with the fact that it cannot be held that in the beginning the defendant gave any authority to Mr. Cabell except in regard to "captured property," we find that he impressed upon Mr. Cabell the fact that he was authorized only to take cotton belonging to the government, and nothing beyond the specific cotton which Mr. Cabell had named; that the proceedings Mr. Cabell was authorized to take in regard to such cotton were proceedings under the act of March 12, 1863, to collect it and ship it, so that it might be sold; and that the representations made in regard to all of the cotton, by Mr. Cabell to the defendant, after it was shipped to New York, were such as to indicate that it was "government cotton," and to warrant the defendant in fairly regarding it as cotton which had been "captured," within the act; and we think the defendant had the right to treat it as cotton to be sold under the act, and to see that its proceeds were paid into the Treasury to await adjudication by the Court of Claims, and was not called upon to take upon himself the responsibility of restoring the cotton or its proceeds to Mr. Lamar, under any representations which are shown to have been made to him by Mr. Lamar in regard to the ownership of the cotton, or in

regard to its status as not being captured or abandoned property, or in regard to the status of Mr. Lamar as having taken an amnesty oath on January 6, 1865, under the proclamation of December 8, 1863, 13 Stat. 737. Nor do we think these conclusions are affected by the contents of the written opinion given by Mr. Eames, in December, 1866.

As to the general instructions issued to officers of the Treasury Department, by the Secretary of the Treasury, on the 27th of June, 1865, we are of opinion that, notwithstanding those instructions, the Secretary of the Treasury had the right to give to Mr. Cabell the special authority which he gave to him.

Under these views, the instruction to the jury to find a verdict for the defendant, on the ground stated in the instruction, was correct.

*Judgment affirmed.*