Campbell, Chief Justice,
delivered the opinion of the court:
The plaintiff sues, as surviving receiver of the Importing & Exporting Company of the State of Georgia, to recover the net proceeds in the Treasury of the United States of the sale of a large amount of cotton which it is alleged was taken from said company, or its officers in charge and control of it, subsequent to June 1, 1865. Recovery is sought under the provisions of section 162 of the Judicial Code, which was enacted in 1911 and reads as follows:
“ Sec. 162. The Court of Claims shall have jurisdiction to hear and determine claims of those whose property was taken subsequent to June the first, eighteen hundred and sixty-five, under the provisions of the act of Congress approved March twelfth, eighteen hundred and sixty-three, entitled ‘An act to provide for the collection of abandoned property and for the prevention of frauds in insurrectionary districts within the United States,’ and acts amendatory thereof, where the property so taken was sold and the net proceeds thereof were placed in the Treasury of the United States; and the Secretary of the Treasury shall return said net proceeds to the owners thereof, on the judgment of said court, and full jurisdiction is given to said court to adjudge said claims, any statutes of limitations to the contrary notwithstanding.”
Speaking of said section, Chief Justice Peelle said in Brandons case, 46 C. Cls., 559, 573: “ Thus, as to property captured, sold, and the proceeds paid into the Treasury subsequent to June 1, 1865 — after the cessation of active hostilities — Congress have revived and applied the act of March 12, 1863, and given the court jurisdiction to hear and determine such claims thereunder.” The act of March 12, 1863, is *139 what is known as the captured or abandoned property act, which has been many times considered in cases in this court and in the Supreme Court. It was held to be a remedial statute, differing in that regard from the confiscation acts of 1861 and 1862, which were penal, and it was said that said acts were not to be construed in pari materia. Haycraft's case, 22 Wall., 81.
We regard it as immaterial, in cases coming properly within section 162, to consider whether the trust-fund doctrine announced in the Klein case, 13 Wall., 128, is to be applied in the breadth of it there stated or whether that doctrine is limited by the later cases of Haycraft, supra; Lamar v. Browne, 92 U. S., 187, and Young v. United States, 97 U. S., 39, or the effect of the declaration in the Intermingled Cotton cases, 92 U. S., 651, 653, that the money in the Treasury to the credit of the fund had often been decided to be “ a trust for the benefit of such as should establish their claim to it under the provisions of the abandoned or captured property act.” Nor need we inquire whether the view expressed in the Klein case and the Padelford case, 9 Wall., 531, that the title to property which came into the hands of Treasury agents duly appointed under the provisions of said act was not divested out of the original owners is altered by the rulings in said later cases to the effect that cotton, because of its peculiar character and the aid it offered the Confederacy, was a proper subject of capture wherever found in enemy country, and that therefore the title of the United States became absolute when cotton was captured in hostile possession and reduced to firm possession. We say these questions are immaterial because admittedly it was within the power of Congress to say what should be done with the proceeds of sales'of captured or abandoned property in the Treasury after the expiration of the period limited by the terms of the original act for suits to recover such proceeds. Thus in Klein’s case (p. 139) it is said: “The property of the original owner is in no case absolutely divested. There is, as we have already observed, no confiscation, but the proceeds of property have passed into the possession of the Government, and restoration of the property is pledged to *140 none except to those who have continually adhered to the Government. Whether restoration will be made to others or confiscation will be enforced is left to be determined by considerations of public policy subsequently to be developed.” (Italics ours.) And in Haycraft's case, 22 Wall., 81, where the claimant sought to recover in a suit brought long after the captured or abandoned property act had expired by its own limitation and predicated his claim upon the theory of a promise by the Government to restore his property, or the proceeds of its sale, thus suing under the general jurisdictional statute applicable to the Court of Claims, it was held that the suit could not be maintained. Declaring that the title of the United States, “whatever may be the rights it carries with it,” was by authorized capture or appropriation of enemy’s property on land, it is said (p. 98): “ But the same statute which authorized its capture gave a right to certain persons to demand and receive a restoration of their property taken,” and provided a remedy for its enforcement, and that the right and the remedy being created by the same statute, such remedy was exclusive. It is added, “That remedy was the only one of which the Court of Claims or any other court has been authorized to take jurisdiction. It is for Congress, not the courts, to determine whether this jurisdiction shall be extended and other remedies provided.” (Italics ours.) Whether it be said that by section 162 of the Judicial Code Congress revived or extended the original act or provided new remedies, the result is the same, because Congress in that enactment have authorized suits in this court by parties who can bring themselves within its provisions and a recovery of the net proceeds of sales of their property yet in the Treasury. The late enactment is remedial in its nature, as the captured or abandoned property act was held to be and is entitled to be liberally construed to effectuate its purposes. In Anderson's case, 9 Wall., 56, 67, it is said that the confiscation act and the captured or abandoned property act “ can not be construed in pari materia. The one is penal, the other remedial.”
The captured or abandoned property act, by section 6 thereof, made it the duty of officers and enlisted men “ who *141 may take or receive any sucb abandoned property, or cotton, rice, sugar, or tobacco, from persons in such insurrectionary districts, or have it under his control, to turn the same over to an agent ” appointed under said act, and severe penalties are denounced against their failure or neglect to comply with said requirements. Section 162 authorizes suits by “those whose property was taken ” under the provisions of the captured or abandoned property act, where the property “ so taken ” was sold and the net proceeds thereof were placed in the Treasury. Whether the original taking was by capture by the military forces or by seizure by Treasury agents, if in either case the property came into the hands of Treasury agents and the proceeds of its sale were paid into the Treasury we hold that the property was “ taken ” within the meaning of that term in section 162. Many suits were brought and recoveries had in this court under the original act where the property had been seized by the military forces. Some of such cases are Wilson's case, 4 C. Cls., 559, being the same as Klein's case, supra; Carroll's case, 13 Wall., 151; Carlisle's case, 16 Wall., 147; Padelford's case, 9 Wall., 531.
A fact, essential by the terms of said original act, to be proved by a claimant thereunder was that he had not given aid or comfort to the rebellion. We have held that no such proof is essential under section 162 of the Judicial Code as to persons coming within the intent and purpose of the general amnesty, issued December 25, 1868. Lincoln's case, 49 C. Cls., 300. This court had long before held it to be unnecessary for a claimant to whom the amnesty applied to aver loyalty in his petition under said original act, notwithstanding the requirement of the statute -prescribing what allegations petitions in this court shall contain, the holding being that the loyalty contemplated by said act was loyalty during the Civil War only, and that the amnesty removed any taint of disloyalty, in that it blotted out in legal contemplation the offense itself. White's case, 19 C. Cls., 440; Officers of South Carolina Troops, 20 C. Cls., 21; Carlisle's case, 16 Wall., 147, 151. Recognizing that principle, we held that while the petitions should conform to section 159 of the Judicial Code as a statute of present and prospective operation, the averments *142 as to loyalty would not be referred to acts done in connection with the Civil War, excepting those not included in the amnesty. Young's case, 97 U. S., 39. It is in every case incumbent upon a claimant suing under section 162 to prove (1) that his property was taken, as above stated, was sold, and the proceeds of the sale were paid into the Treasury; (2) his ownership of the property when it was taken. His recovery is by the statute limited to the net proceeds of the sale in the Treasury. We have also held that the suits should be in the name of the original owner or his executor, administrator, or other legal representative, and not in the names of his heirs.
It is apparent that the question of the ownership of the property when taken is an important one, and we must accept the rulings under the said original act upon similar questions arising under the later act. We have accordingly held in two cases, one of which is on appeal to the Supreme Court, that where it appeared that a claimant sold his cotton to the Confederate States, or their agents, for their bonds, but remained in possession and was in possession of the cotton after actual hostilities had ceased, when it was seized by Treasury agents and sold under the provisions of said act, he could not recover, because by the sale he had parted with his title and ownership. In so holding we followed the Whitfield case, 92 U. S., 165, which declares that contracts of sale made in aid of the rebellion will not be enforced by the courts, but that completed sales occupy a different position.
We have made some general observations relative to cases under said section because of the number and variety of the cases now pending in this court under the law. Upon the filing of the instant case the defendants filed a general traverse, or it was regarded as so filed under the rules of the court. No special pleas were filed.
In their brief and argument the defendants attack the incorporation of the importing and exporting company in whose right the receiver Basch brings this action.
Corporations could sue as such under the captured or abandoned property act. Hebrew Congregation case, 6 C. Cls., 241; Home Insurance Co. case, 22 Wall., 99. It was *143 beld in Hebrew Congregation, supra, that the claimant should not be required to prove its incorporation unless the allegation of its incorporation is specially pleaded by a plea of nul tiel corporation. In the Insurance Company case, supra, the Supreme Court states the rule to be that a plea of the general issue admits the capacity of a corporation claimant to sue and adds (p. 101): “And such is the established practice in the Court of Claims.” The rule was followed in Southern Pacific Co, case, 28 C. Cls., 77, and in Philippine Sugar Estates Development Co. case, 89 C. Cls., 225, 237. Under this rule the question raised by defendants as to the legal existence of the said company is foreclosed. But inasmuch as the argument goes to the right of the company, or, as in this case, to the right of the receiver to a standing in court, we will examine the basis of the argument. It is argued by counsel for the defendants that said company is a creature of the Legislature of Georgia at a time when that State was in open hostility to the Union; that the incorporation was for the purpose of violating the laws of the United States, and that therefore the corporation has no legal existence nor any right to appear in this court.
The fact is that said company did not have a legislative charter, but was incorporated, if at all, under the general laws of the State of Georgia providing for the incorporation of various kinds of business and other corporations. Copies of some of the proceedings under which its regular organization are claimed are attached to the petition herein. They will appear more at length in the findings of fact.
The codification of statutes and certain other laws applicable to Georgia was authorized by an act of the legislature approved December 19, 1858, and the commissioners appointed to perform that duty duly reported the result of their labors prior to December 16,1859, at which time a committee was appointed by the legislature to examine and. report upon the said work. The code as prepared was submitted to the legislature, and on December 19, 1860, was “ adopted as the Code of Georgia, to be of force and take effect on the 1st day of January, 1862.” In the meantime the State of Georgia having joined the Confederate States, *144 an act was passed in 1861 suspending the operation of the code until January 1,1863. This appears to have been done in order to adapt many of the laws to the new relation assumed by the State. It does not appear that any of the provisions relative to incorporation were in anywise changed from what they had been in the code as approved in 1859. The section under which said company claims incorporation is section 1631, which was a statute enacted as far back as 1839 and brought forward, with some modification, into the code. It occurs in the part of the code which refers to the creation of corporations.
Under these circumstances we think there is no merit in the contention that the legislation in question was in hostility to the authority of the United States within the rule of the decisions. Insurance Companies’ case, 22 Wall., 99; Horn v. Lockhart, 17 Wall., 580. The general laws for incorporation were mere ordinary legislation such as might have been if there had been no war or no attempted secession and such as is of common occurrence in the States. The circumstance that the laws were availed of in 1863 when the Avar was flagrant, and that it may have been the purpose of the incorporators to violate the blockade, may go to the question of the corporation’s action, but do not render void the incorporation proceedings or establish the fact that the company had no legal existence. For its acts done in violation of law or for any acts of disloyalty the company as a legal entity was answerable, and its property was liable to seizure, as that of individuals was under similar facts and circumstances. A combination effected contrary to the prohibitions of the antitrust acts has a legal existence for many purposes when the legality of its existence is collaterally assailed. It may acquire, hold, and transfer property. Connolly v. Union Sewer Pipe Co., 184 U. S., 540. The doctrine announced in Continental Wall Paper Co. v. Voight, 212 U. S., 227, is materially qualified by Wilder Mfg. Co. v. Corn Products Co., 236 U. S., 165. The laws of the United States and the proclamation of the President of April 19, 1861, established a blockade, but the law did not forbid the creation under State laws of a company with power to en *145 gage in. a business having the direct trade with foreign countries as its object. If in attempting to carry out its charter powers the corporation in anywise violated the blockade, its property became liable to the penalty which followed such violation. The proclamation of April 19, 1861, was modified by that of May 12, 1862, which declared that the blockade of the ports of Beaufort, N. C., Port Royal, S. C., and New Orleans should cease from and after June 1, 1862, and that commercial intercourse with those ports, “ except as to persons, things, and information contraband of war,” could be carried on subject to the laws of the United States and regulations of the Secretary of the Treasury. To hold that a company the declared purpose of whose incorporation was “ to carry on the business of importing and exporting goods, wares, and merchandise from and to foreign countries,” because of the fact of incorporation at a particular time and its becoming owner of “ cotton besides other property,” was an illegal organization is in effect to ascribe an illegal purpose when an equally tenable assumption, considering the face of the proceedings alone, would be that the company’s purpose was to import and export goods, wares, and merchandise through the free or unblockaded ports. The purposes of the proposed corporation when the declaration was filed were the purposes and intentions of the incorporators individually or jointly. Whatever the corporation afterwards did was by the hand of individual persons. Persons acting individually or jointly directed, conceived, and carried out its activities and policies, and for anything disloyal in their action such persons have been pardoned and the offense obliterated. The corporation as a legal entity could be guilty of disloyal acts such as would have defeated any right to recover under the captured or abandoned property act if it had sued within the time of that act. Insurance Co. cases, 22 Wall., 99, 104.
Nor do we mean to imply in what has been said that the corporation is not distinct as an entity from its stockholders and agents, or that it would be any the less responsible for its acts because it had to think and act through natural persons ; but we think it would lead to a strange result to hold *146 that all the persons engaged in or about the company’s business, its incorporation, its purposes, and its dealings have in law committed no offense, but that the corporation itself, because of said things, was never a legal entity. This court considered the question in the case of Officers of South Carolina Troops, 20 C. Cls., 18, and after stating that since the President’s proclamation of pardon and amnesty, promulgated December 25, 1868, and the effect given to it by the Supreme Court, the loyalty of citizen claimants under sections 1072 and 1073, Revised Statutes, had not been a subject of inquiry in this court, the opinion proceeds (p. 21) : “These officers have been pardoned. Oblivion is thrown over all their disloyal acts. It is as if such acts had never been committed. Knote’s case, 10 C. Cls. R., 407; Armstrong's case, 13 Wall., 154. Since these acts can not be invoked against the person who committed them, can they be invoked against a corporation of which they were the officers? If the corporation is to be charged with the offense of its officers, should it not be credited with their pardons? The sin of the officers works a legal effect in the corporation. The sin is pardoned, but the effect, say the defendants, is not. The sinners can come to this court, but the corporation, sinless, because devoid of moral qualities, can not. We think the position involves a question in ethics too subtle for practical adjudication.”
The action is brought by a receiver appointed by the Superior Court of Georgia under a bill filed in 1881. The code to which reference has been made provides that when a corporation expires by limitation fixed by law for its existence the superior court could “ appoint a receiver under proper restrictions properly to administer ” its assets under the court’s direction (sec. 1642); and that “ all of the property and assets of every description belonging to the corporation shall constitute a fund first for the payment of its debts and then for equal distribution among its members.” There is thus enacted into statutory law the equitable rule upon which courts of equity proceed in cases of a dissolved corporation that its assets are a trust fund for the benefit of its creditors and stockholders, and that the court will appoint a receiver of them upon the principle that courts of equity do not allow *147 a trust to fail for want of a trustee. Curran v. Arkansas, 15 How., 304, 311. Some difference is made by counsel in the instant case as to whether said company’s existence, assuming it to be a corporation, was limited by the law under which said declaration was filed to 14 or 30 years; that is to say, whether its existence ended by lapse of time in 1878 or 1894. The difference may be regarded as immaterial. The bill under which the superior court appointed a receiver of the company is not before us, we having, only the decree making the appointment, but whether the appointment was made in 1881 because of the dissolution of the corporation or for other equitable cause, it appears that the suit was pending in 1911 when plaintiff was made a coreceiver with the original appointee. Plainly the bill could be amended by an amendment in the nature of a supplemental bill setting forth the fact that the corporation had expired by lapse of time and no doubt the court’s decree would be so molded as to require the administration of the fund in accordance with said statutes and equitable rights. We may assume, if necessary, that such will be done, and at least we can withhold judgment in the case, if a right of recovery appears to exist, until this court is satisfied that a proper party to collect the judgment is before the court. We deem it unnecessary, therefore, to suspend further consideration of the case at this time.
The Government supplements its contention, to which we have referred, by insisting that the said company was “ a blockade-running company,” and can have no standing in this court. That insistence is answered by the language of the captured or abandoned property act, as well as by the language of section 162. The act authorized suit “by any person claiming to have been the owner,” and required proof of certain things as a condition of recovery. Section 162 authorizes suits by “those whose cotton was taken.” -The act makes no distinction between natural and artificial persons. Insurance Co. case, 22 Wall., 99, 104. In the Sprott case, 20 Wall., 459, where the act of Sprott in purchasing cotton from an agent of the Confederate States is condemned" in the strongest terms, the claimant was not denied a right to come into court and propound his claim under said act, *148 but bis right to recover was denied, because it was held that the court would not recognize the transaction as a transfer or sale that could pass title to Sprott.
It is true that as late as September 27, 1865, the Secretary of the Treasury, in a letter addressed to the Treasury agents engaged in the collection of captured or abandoned cotton, stated that applications were frequently made to him for the suspension of proceedings in relation to cotton “ claimed as the property of certain corporations or organizations entitled ‘exporting and importing companies’ or similarly named existing in the late so-called Confederate States”; that he had so far declined to act, but on account of the frequency of the applications and the magnitude of the claims it seemed necessary to make some general rule for the guidance of agents. ' And the Secretary states that “ from the titles as well as from what is known of the operations of these companies it is evident they were mere auxiliaries of the so-called Confederate Government”; that the property owned by them was used and intended to be used for the purpose of overthrowing the Government of the United States, “ though individual gain may in some instances and to some extent have actuated their managers ”; and he directed that wherever any property owned or claimed “ by one of these blockade-running companies ” was found the agent should “ take charge and treat it as property which was used to aid the rebellion, and therefore belonging to the United States by the right of capture, keeping in all cases the record required by regulation 4, series of July 29, concerning captured and abandoned property.” Lest his instruction might be misunderstood, the Secretary further stated that his order was intended to apply only to such property of the class named “ as may have been collected and kept together as the property of such companies,” and that it was “ not intended to authorize agents to search for on different plantations and to seize small and scattered lots said to have been purchased for and by such companies, but which has not been collected by them in distinctive lots and so held ”; and that operations under that letter “ are limited to large lots.”
But it is equally true that the instructions of the Secretary to the agents to seize the cotton for the reasons stated by *149 him would not prevent a party claiming ownership of the cotton from asserting his claim thereto under the act which furnished the Secretary the authority to appoint agents to receive captured or abandoned property. The Secretary directed his agents to keep the record required by said act and instructions issued under the same. And as his authority was derived from said act and his agents were appointed by virtue of the act, the property received by them was held subject to its provisions. Any other view would lead to the conclusion that because the Secretary was satisfied that propel ty claimed by an individual or corporation was used in furtherance of the Confederacy his decision of the question would be final, notwithstanding the said act gave jurisdiction to a court and not to the Secretary to determine the fact. Certainly the fact that an importing and exporting company “ claimed ” the property could not defeat a right of the real owner to sue and recover. To again quote from the act, it provides that “any person claiming to have been the owner of any such abandoned or captured property” could propound a claim in this court, and that the proof of certain things would authorize a recovery. Broad as the expression “ any person ” is, it does not include a right of recovery in favor of one who claims property that belonged to hostile organizations or that was employed in actual hostilities on land. “ These descriptions of property, like property of other like kind in ordinary international wars, became wherever taken ipso facto the property of the United States.” Klein case, 13 Wall., 128, 136. If the said company was a “ mere auxiliary of the so-called Confederate Government,” or was its agent, or held cotton for it or in which it was interested, there could be no recovery for such cotton under the captured or abandoned property act, nor under section 162. Klein's case, supra. But the fact should not rest in mere assumption. The record shows that there were “blockade-running” companies in said section, “the Bee, the Ghicora, and others.”
In Lamar v. Browne, 92 U. S., 187, it is stated (p. 188) that there was evidence tending to show that Lamar had stored certain cotton in warehouses in Thomasville; that on June 19, 1865, a part of this cotton was his individual prop *150 erty, stored in bis name, and part was the property of the Importing & Exporting Company of the State of Georgia and stored in his name as president of the company; that said company, “though a blockade-running company, had never run any cotton through the blockade, but had, during the rebellion, bought several steamers in England and brought them into Confederate ports for that purpose.” It is clear that the question as to whether the cotton, for the conversion of which Lamar sued, belonged to him individually or as president was an issue that could have been raised in said case, and that upon proof that the cotton belonged to the Confederacy or that Lamar and the company were auxiliaries of the Confederacy the suit must have failed on that account. Browne, and not the United States, was party defendant, and during the period of that litigation Congress repeatedly made appropriations for the defense of cases arising out of the seizures of property under said act. The Assistant Attorney General appeared for Browne, the defendant in error, in the Supreme Court. When that case was tried there were living witnesses. Lamar could, and probably did, testify in that case, but he could not have been a witness in the Court of Claims in his own behalf in an action brought under the captured or abandoned property act. Act of June 25, 1868, 15 Stat., 75; Hubbell's case, 4 C. Cls., 37. The defendants could, however, examine the claimant if they chose. Hubbell's case, supra. Lamar v. Browne was not decided upon the question of title or ownership, but upon the point that the Treasury agent could not be held liable in his individual capacity for acts done as agent of the Government. The question of ownership can not be said to have been settled there. The Supreme Court in their opinion show the purposes of the said act and the authority it confers on this court, and-it is pointed out that in cases like that before them the Court of Claims was the proper forum in which to determine the rights of the parties, stating (p. 194) that “ for the purposes of capture property found in enemy territory is enemy property without regard to the status of the owner. In war all residents of enemy country are enemies,” and that “ knowing this,” and on account of the humane maxims of the modern law of nations which exempt *151 private property of noncombatants from capture as booty of war, “ Congress passed the abandoned or captured property act. The capture of hostile property was in this way authorized by the United States, even though it should be owned by private parties. The military authorities were permitted to make their seizures, but careful provision was made for the collection of the property seized; its conversion into money, to be deposited in the National Treasury, there to remain, according to the ruling in Klein’s case, in trust for those who were by that act declared entitled to the proceeds.” It is said (p. 195) that the act “ gave the Court of Claims authority to adjudicate between the belligerent sovereign and the citizen and to determine the question of capture or no capture.” And again (p. 198), that acting upon the principle that if anything was done amiss in the matter of capture “ recourse could only be had to the Government for redress,” “the United States delegated to the Court of Claims the necessary authority for the redress of grievances under such seizures by the military forces.”
It seems clear that the question of whether said company was an “auxiliary of the so-called Confederate government,” as well as the question of its ownership of the cotton, is involved in the instant case. If the fact be conceded that it was a “ blockade-running company ” we can not see how that fact alone can prevent a recovéry under section 162. It would have defeated an action under the older act, because the act of blockade running was an act of disloyalty, and it was necessary that a claimant prove he had not given aid or comfort to the rebellion; but, as we have shown, cases under section 162 stand in a different condition than those brought under the older act as regards the question of loyalty. It is not the degree of disloyalty but the fact of it which defeated the claims of disloyal claimants, and we can see no difference in legal contemplation between the act of blockade running and the act of armed forces in the field in opposition to the lawful government. One may have been surreptitious disloyalty and the other open disloyalty, but both gave aid and comfort to the rebellion. The proof of disloyalty alone does not show that a blockade-running com- *152 party was an auxiliary of the Confederacy or was its agent or held property of that organization.
We hold, therefore, that for the purposes of this suit the Importing & Exporting Company of Georgia was a corporation, and that its duly appointed receiver is the proper person to bring the suit under section 162 of the Judicial Code.
An important question is whether said corporation was the owner of the cotton for the net proceeds of which suit is brought at the time of its seizure.
In Rhine's case, 14 C. Cls., 268, it is said (p. 270), with, reference to a claim of ownership under the captured or abandoned property act, that “in the absence of circumstances to cast a doubt upon the claimant’s title, it [the court] is generally satisfied with that evidence of possession or apparent right of control which, in the ordinary occupations of life, raises the presumption and gives ground for the belief that the person who is.in possession of or has the right of control over property is its owner. If no circumstances arouse suspicion and cause the good faith of the claimant to be questioned, great injustice may be done by disregarding prima facie evidence of ownership and calling for the strictest proof. Especially may this be so if a claimant’s alleged title is fiduciary or representative.”
In Murphy's case, 14 C. Cls., 537, 538, it is said:
“ It is urged that there is not satisfactory proof of ownership of the property claimed by the petitioners. This objection is met by the findings of fact. The claimants were in the unchallenged possession of the property. They controlled it, and stored it for safekeeping in the place where it was found. No adA’ersary title to it is advanced by any other person. Under such circumstances they must be deemed to have been the owners of it.”
It was early held that “ the evidence of ownership of the property required is at least equal to that necessary to sustain an action of trespass or trover. The ownership must be a bona fide one, not collusive or colorable.” Bond's case, 2 C. Cls., 528, 532.
The action of trover is not grounded upon the mere possession without claim of interest or ownership (Walker v. *153 Reister, 102 U. S., 467, 471), but actual possession is generally speaking 'prima facie evidence of ownership in the absence of anything casting doubt upon the claim of ownership in actions of trespass. Northern Pacific R. Co. v. Lewis, 162 U. S., 366, 373.
The claim herein involves a large amount of cotton claimed to have belonged to said company and located at divers places in Georgia, Alabama, and Florida. The “ Thomasville cotton ” is claimed to have been taken at or near Thomas-ville, in Georgia, by the military forces of the United States after June 1, 1865, and later delivered to the Treasury agents. The cotton so taken was stored in warehouses in Thomasville.
The facts show that on June 19, 1865, when Col. William K. Kimball, Twelfth Maine Voluntary Infantry, United States Army, arrived at Thomasville with his command he occupied that place and immediately took possession of all .Confederate property and of warehouses which he had been informed contained cotton subject to confiscation. He required each warehouseman to furnish him a list of the contents of his house with the name of the owner of each bale. This requirement was complied with to the officer’s satisfaction, and some of the warehousemen merely exhibited their books. Guards were placed over the warehouses and no other possession was taken, but that character of possession continued uninterruptedly until Col. Kimball, under military orders from Brevet Maj. Gen. Brannan, delivered all of the said cotton to A. G. Browne, the special Treasury agent in that district. Said order for delivery to the Treasury agent was issued to Col. Kimball August 9,1865, and on August 15, 1865, the cotton was by him delivered to said agent, who executed a receipt therefor. At the time of such delivery and receipt the cotton was still in the warehouses and the receipt did not identify any particular cotton by its mark, but later after said agent had,- through his employees, assorted the cotton, he furnished Col. Kimball with another receipt dated January 24, 1866, in which it was stated that it was impossible at the time of the first receipt, August 15, 1865, to invoice the property except in bulk, the marks and weights not then having been ascertained, and that said in *154 voice was delivered at the date of the later receipt. That receipt and invoice show the delivery to said agent of 1,018 bales of cotton “ claimed to be the property of the Importing & Exporting Company of the State of Georgia”; 484 bales “ claimed to be the property either of G. B. Lamar or the Importing & Exporting Company of the State of Georgia ”; beside some other cotton claimed to be the property of the State of North Carolina and some as the property of the State of Georgia. Appended to the receipt was a list showing the number of bales, their marks, and weights of the bales. The same will appear in the findings of fact.
The cotton was thus in the possession of the military forces and later in the possession of the Treasury agents, by whom it was in due course sold and the net proceeds paid into the Treasury. We have not a case of the cotton being in the actual possession of the claimant when it was seized, because a large part of it was in the possession of warehousemen. Other parties whose suits are now in court claim that some of the cotton taken as belonging to Lamar, or said company, was the property of said other claimants. It is claimed in some instances that cotton seized as property of said company, and so reported by the agent, was property of Lamar individually or of partnerships of which he was a member.
In such cases it is manifest that the agent’s report of the cotton as being the property of a particular party can not be conclusive against the claim of other parties claiming to have been the real owners.
The captured or abandoned property act authorized a claimant suing thereunder to recover “ on proof to the satisfaction of the court of his ownership of said property, of his right to the proceeds thereof,” and that he had not been disloyal. Section 162 does not require any higher degree of proof of ownership than the said act required. The ownership must be shown “ to the satisfaction of the court.”
The plaintiff contends that “Executive Document No. 23 ” should be accepted by the court as showing the owners of the cotton therein referred to. That document purports to be the report of the Secretary of the Treasury made in response to a resolution of the Senate of the 18th day of December, 1873, which called upon the Secretary for a report *155 as to “ the number of bales of cotton seized under orders from the department after the close of the war, from whom taken, by whom taken,” at what price they were sold, and a number of other details. The report made a tabulated statement of the several matters called for, and in one column headed “ From whom collected ” stated the names of numerous parties, among them said company’s name. In other columns are stated where collected, the number of bales, where sold, the price realized, etc.
Manifestly the statement “ From whom collected ” is the conclusion of the Secretary based upon information in the files of the department. That information is accessible to this court, and the practice has been to make a “ call on the department ” for the desired information. That course has been followed in the instant case. The document is a valuable one and may at times be consulted, but it is not con-' tiolling in all of its deductions upon the court.
The plaintiff claims that certain of said cotton was taken at Thomasville, Ga., being a part of that involved in the case of Lamar v. Browne, 92 U. S., 187; that some of its cotton was taken at other places in Georgia; that some was taken in Florida, which was involved in the case of Lamar v. McCulloch., 115 U. S., 163; and that some was taken in Alabama.
What we have said with reference to the Thomasville cotton applies principally to that which was seized by Col. Kim-ball and delivered to Agent Browne. There was other cotton seized at that place. There was also cotton seized by other agents than Browne at divers places in Georgia. As we have said above, the net proceeds in the Treasury of the sales of cotton must be the limit of recovery regardless of the number of bales that may have been seized. The cotton alleged to have been taken at other places in Georgia and to have belonged to said company was taken subsequent to June 1, 1865, by Treasury agents. Sometimes cotton was taken as the' property of said Lamar and at other times as the property of said company, and the same remark may be made as generally applicable to the Florida cotton.
The record shows that Gazaway B. Lamar was the president of said company and practically controlled its affairs. Lamar’s books and papers, as well as those of said company *156 being in bis possession, were seized in December, 1865, by the military forces upon a charge being preferred against him, for which he was tried and convicted by a military tribunal.
Lamar, who, at the breaking out of the war, resided in New York City, and was president of the Bank of the Republic, removed to Savannah, where he later became president of the Bank of Commerce there. He seems to have controlled large capital and to have dealt largely in cotton. He controlled said company and managed its affairs; but so far as the record shows his activities in trade were on individual or private account for himself or for the company. He brought a suit in this court in 1867 under the captured or abandoned property act relying upon an amnesty granted to him in 1865, and recovered a judgment some years later for over half a million dollars for cotton taken from him at Savannah and sold. The evidence in that case, where the witnesses were examined and cross-examined, may be referred to in this case for any light it will throw upon the ownership of the cotton in question. That evidence discloses -that Lamar, as well as said company, had cotton at other places in Georgia and in Florida. In the original petition filed by Lamar in said case he claimed the proceeds of sale of a large amount of cotton, besides that at Savannah, which was seized at other places. At the hearing of the case an amended petition had been filed which confined the claim to the Savannah cotton. In the meantime the suit of Lamar v. Browne, 92 U. S., 187, had been brought, as also that of Lamar v. McCulloch,, 115 U. S., 163. Lamar was not a witness in the suit filed in this court, the statute applicable at that time to suits in this court forbidding a claimant to be a witness in his own behalf, but it appears from the testimony of others claiming to be cognizant of the facts, that Lamar owned large quantities of cotton in Georgia and Florida and that he had sold a large amount to said company.
Shortly after Mr. Browne took charge of the cotton delivered to him by Col. Kimball an action of trover was brought or attempted to be brought by suing out a writ against him in the Superior Court of Georgia in behalf of said company as claimant to some of the Thomasville cotton, *157 but nothing was done in that case. Bepeated claims were made by Lamar on said agent for the cotton, and the latter’s reports to the Treasury Department make frequent mention of Lamar’s activities in that regard. Lists of cotton claimed by Lamar and of that claimed for the company were furnished Mr. Browne. From the time the cotton reached the possession of the Treasury agents, and during some years thereafter, Lamar, on behalf of himself and of said company, claimed said cotton as his own or that of said company. He died in 1874. The period for bringing suits under the captured or abandoned property act expired in 1868. In some cases where the cotton was taken the record shows that it was taken from persons who claimed to hold it for Lamar or for said company, and it was so stated. The cotton was taken and reported as taken as the property of one or the other of said parties. It was sold, and the net proceeds were paid into the Treasury.
For reasons hereinafter appearing it is not our purpose to discuss in detail the several items of claim. Insisting that the proof shows the taking of the property under the circumstances mentioned; that it was taken in some instances as the property of particular individuals, including said company; that its claims have been repeatedly asserted to the cotton so taken; and that the proof shows that said company did in fact own some cotton, the plaintiff offers in evidence certain boobs, called cotton books, of Lamar and said company; and their introduction is objected to by the defendants. The cotton books and all other books and papers belonging to Lamar and said company and in his possession were taken from him in December, 1865, as above stated, and later they were sent first to the War Department and then, in October, 1866, to the Treasury Department, where they now are, except such as have been lost or misplaced. During the taking of testimony in said case of Lamar v. United States the deposition of A. S. Lawson was taken, who, testifying, stated that during the years 1862 and 1868 he was Lamar’s bookkeeper and was familiar with his business operations; that said boobs were kept by him (the witness), were in possession of the Government, were consulted by him in giving his testimony, and that the boobs *158 of Lamar and the company were kept separately. Some of these books are still in the Treasury Department, but some of the books and many of the papers and documents have been lost or misplaced. What are called the cotton books of each of said parties have been produced in this court at the hearing of this case. There were also produced many warehouse receipts for cotton dated in the period of the war and issued by warehousemen, besides other old documents. Said books are apparently records of invoices of cotton or receipted invoices of cotton as bought from divers persons in the said localities, frequently showing the marks of the cotton, though other entries appear.-
In Hammerschlag v. Duryea, 68 N. Y. Supp., 1061 (see 172 N. Y., 622), the question arose as to the possession and ownership of certain real estate in New York. It became necessary to show acts of ownership prior to 1859, and for that purpose they offered in evidence entries in the books of the New York Hospital, who claimed to be owner, containing statements in respect to the lands, showing that the hospital had exercised acts of ownership upon them from time to time; that taxes had been assessed upon them as a portion of its property; that upon petition of the hospital, addressed to the officers of the city, it was claimed that the property belonged to the hospital and was held by it as owner, and said taxes were remitted; and there were also other entries tending to show acts done upon the property which the hospital would have had no authority to do unless it had been the absolute owner of the lands. It was contended that the entries in the books of the hospital were not competent because substantially entries in its own interest. The court said: “ That these books in which the entries were made are the minute books of the hospital can not be denied. They came from the place where such books are deposited, and the evidence tended to show that they bore all the evidence of genuineness.” It was said that they were not history of past transactions, but were ancient, having been made over half a century ago; that they came within the exceptions to the rule rejecting hearsay evidence; and they were admitted as tending to show ancient possession. See also Dodge v. Gallatin, 130 N. Y., 107.
*159 We think the principle applicable here, though the question in this case involves personal property. The proof tends to show the purchase of cotton at different places and that it was not stored in one place but may have been left in the hands of agents at other places where purchased. We think after the lapse of 50 years it is competent to show from the books of the company references to these particular transactions. It would be exceedingly difficult in any case to show that the company was in actual possession of cotton bought and stored according to what was apparently the custom of the times with reference to purchases of cotton and its storage. The New York case we have cited makes a distinction as to the entries that may be narrative of past transactions, but the ancient record of bills of sale or receipted invoices may themselves tend to show that there were original bills of sale or receipted invoices in existence when the copies were made. Williams v. Conger, 125 U. S., 397, 423.
The plaintiff claims that the entries in said books not only tend to prove the control which Lamar individually or as president of said company had and exercised over certain cotton and its consequent ownership, but also that by tracing the marks shown on the cotton taken by Mr. Browne through said books it can be shown that the same cotton is referred to in the books and Mr. Browne’s list; and, further, that entries refer to cotton as having been purchased in the localities where subsequently it was seized as the property of Lamar or the company.
These books have been in the possession of the Government for more than 50 years. The original warehouse receipts and documents in Lamar’s possession showing transfers of cotton are at this late day self-proving. In cases brought under section 162, where the United States has defended upon the ground that the cotton for the proceeds of sale of which suit was brought had been sold to the Confederate States or to some agent of the Confederate States, we have not hesitated to admit the bills of sale or transfers by individuals which came into possession of the United States when they secured the archives of the Confederacy. These were admitted upon the ground that they are ancient doc,u- *160 ments and came from the proper source. There is no living witness to identify the books in question, and except what is said about them by the witness Lawson in Lamar v. United States their authenticity can not be established further than by the fact that they were taken from Lamar as his or his company’s books in 1865 and have been in the Government’s possession ever since. There is nothing in the books themselves to arouse suspicion that they are not genuine. As already stated, a large number of the entries in the cotton book purport to be copies of invoices of so many bales of cotton bought from divers named persons at named prices, with the bales listed by marks and the weights, followed in many instances by a receipt for the purchase price with the vendor’s name affixed and the dates, which in most cases were during 1862 and 1868, though entries in 1864 or 1865 also appear. Whether the originals of all of these invoices or bills of sale went into the Government’s possession when the business and private papers of Lamar, including the books and papers of said company, were seized is not and can not now be made to appear. The Government admits the loss of many of the papers and some of the books that it received in 1865. We think the books are admissible upon the broad principle that they are the best evidence that can at this late day be adduced as a link in the chain of proof to show that the cotton which was taken or some of it was owned by said company. In or by themselves, and considered independently of other proven or admitted facts, the books could establish little. But the Government’s agent took certain cotton as the property of said company; the bales in some instances were each marked and were listed by him by marks. The company or its president asserted ownership of the cotton after its seizure, and to establish the ownership of the particular cotton the plaintiff proposes to trace the same by its marks through the company’s and Lamar’s books or to show entries in said books regarding the cotton in question or some of it. That the opportunity to do so should be given we have no doubt. It is not to prove title independently of other facts that the books are to be used, but rather as a means and the only means now available to the parties of identifying as theirs the cotton which when *161 seized was taken by the Government’s agents as cotton belonging to one or the other of them and was seized because it was treated and considered by the agents to be their property.
The record shows that Special Agent Browne objected to the return of Lamar’s books and 'papers to him, and that later, after that officer had retired from his office as special agent, he wrote to the Secretary that his examination of said books and papers convinced him that the United States had title to the cotton, or a large part of the cotton, in question in this case. While Mr. Browne’s statement can not be accepted as evidence — made, as it was, after his connection with office had ended — it at least furnishes an additional reason why the court should examine said books and papers, even though the defendants object to them as evidence. This court must determine whether said company was the owner of the cotton which was taken as its property, and must pass upon the competency of evidence offered, but it must also, as a jury, so to speak, determine the weight to be given the evidence when admitted. To exclude the books may amount to a denial of justice, because there are no living witnesses, and original papers are not forthcoming — a failure for which the company may not under the established facts be chargeable.
It is to be conceded that the fact of seizure of the cotton as property of said company is not sufficient proof that it was, in fact, the company’s property. The agents may have been mistaken, and seized as the company’s cotton property of another. This makes necessary some other proof than said fact of seizure as the company’s cotton. It is in evidence that Treasury Agent Browne made a list of the cotton which came into his possession, listing it by marks and number of bales, and reported so many bales as cotton claimed by the several parties he mentions. He had access to the ware-housemen’s books and papers, and we have not. Indeed, said agent states in one of his reports that he had free access to the warehouse books of Evans & Parnell, with whom the cotton was stored, and that from them proof had been gathered that some 600 or 700 bales were the property of the *162 company. It also appears from said report that the agent’s inspection of the cotton showed some of it to have been in a bad condition, because the cotton had been stored for some years without sufficient protection against the weather. Some significance must be given to the fact that upon the investigation open to him he separated the cotton into several claims of ownership. The captured or abandoned property act required the keeping of a book or books of account “ showing from whom such property was received,” etc., and the presumption is that the agent tried to discharge his duty. Nicholls v. Webb, 8 Wheat., 326, 337.
The United States do not claim to own the proceeds of the cotton of private citizens. The Congress must have recognized that there would be inherent difficulties attending the proof of owners of the cotton taken nearly 50 years before the act of 1911 was passed, and to have extended such latitude to the ordinary rules of evidence that evidence which would tend to prove the essential facts would not be excluded upon merely technical grounds. The tendency both of legislation and of the decisions of the courts is to give as wide a scope as possible to the investigation of facts. Holmes v. Goldsmith, 147 U. S., 150, 164. This is particularly so when the court is called upon to decide questions arising out of relations and transactions of half a century ago, and where the .court must consider not only the competency but the weight of particular parts of the testimony offered. It was said by Mr. Justice Story in Nicholls v. Webb, 8 Wheat., 326, 332, “ that as the rules of evidence are founded upon general interest and convenience they must from time to time admit of modifications to adapt them to the actual condition and business of men or they would work manifest injustice.”
As a link or circumstance in the plaintiff’s claim of ownership we think the said books are admissible, as also are original warehouse receipts for cotton and original receipted invoices for cotton found in the Treasury Department as part of the documents and papers taken from Lamar.
It appears from the record that when some of the cotton was seized it was in possession of persons who stated that it was the property of Lamar or Lamar as president of said company. It was taken and reported by the Treasury agents *163 as the property of the one or the other. The statements of the person so in possession are competent evidence upon the question of possession as being the declaration of an agent whose possession under such circumstances would be the possession of his principal.
A question arises as to the claim to some cotton alleged to have been taken in Alabama which is different from the other questions discussed. In the first place the report of the Treasury agent does not identify the cotton as that of said company, and his designation could appropriately be referred to another company. In the second place it is not shown that the proceeds of that particular cotton reached the Treasury. Boss case, 92 U. S., 281; Lincoln case, 50 C. Cls., 70.
It appears that part of the cotton claimed to have been seized was insured and afterwards burned; that the insurance was collected by the Treasury agent and paid into the Treasury. There can not be a recovery on account of the burnt cotton. The statute limits the court to the net proceeds of sale in the Treasury, and where there was no sale but a burning we are without authority to follow the proceeds of the insurance or to treat the insurance collected as “ net proceeds of sale.”
Claim is also made for some cotton sold to A. Stow & Co., in October, 1865, by P. D. Woolhopter. The said purchaser not having paid in full for the cotton the payments were intercepted by the Treasury agent upon the ground that the cotton belonged to said importing and exporting company. The evidence tends to show that Woolhopter sold to Stow cotton belonging to said company; that subsequently Stow paid the agent instead of paying Woolhopter; and that the agent paid the proceeds of such collection into the Treasury. If such be the f^cts we think there could be a recovery for the amount of said proceeds so paid in, and, further, that the statement of Woolhopter (who was the apparent vendor), though made subsequent to the sale, that the property was in fact that of said company, would establish the company’s right to recover said proceeds.
Suit has been brought by the administrator of Gazaway B. Lamar, deceased, to recover under section 162 for part of the *164 cotton taken by one or more of the Treasury agents, and particularly for part of the Thomasville cotton. Administrators of other parties alleging a joint ownership by said parties with Lamar of some of the cotton have also sued. There are several suits by other administrators claiming that their decedents owned some of the cotton taken at Thomasville and reported as the property of Lamar or of said company.
It is apparent that following its practice in like cases the court should require said parties to interplead, to the end that the rights of each can be determined and the whole question be settled in this proceeding.
Motions to be allowed to intervene and to file their claims in the instant case by several of said parties will be allowed, and an order will be entered requiring all of said parties to propound their claims in the instant case to any of said cotton mentioned and referred to in the petition herein.
The entire matter will be referred to a special auditor to be appointed by the court, who will proceed under the principles stated in this opinion and in accordance with the directions of the order appointing him. All other questions are reserved until the coming in of the auditor’s report.
PIat, Judge, DowNEr, Judge, BabNey, Judge, and Booth, Judge, concur.